## THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| GLOBAL ALUMINUM DISTRIBUTOR LLC, | ) | |
| Plaintiff, | ) ) ) | |
| HIALEAH ALUMINUM SUPPLY, INC., | ) ) | |
| Consolidated Plaintiff, | ) ) | **NON-CONFIDENTIAL** |
| KINGTOM ALUMINIO S.R.L. | ) | Proprietary Information Removed from |
| Plaintiff-Intervenor, | ) ) | Pages 14 to 18, 20 to 23, 26 to 31, and 35 |
| v. | ) ) | |
| UNITED STATES, | ) | Consol. Ct. No. 21-00198 |
| Defendant, | ) ) | |
| TA CHEN INTERNATIONAL, INC., | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## BRIEF OF PLAINTIFF-INTERVENOR KINGTOM ALUMINIO S.R.L. <u>IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

February 14, 2022

*Counsel to Kingtom Aluminio S.R.L.*

14929191 v1

# TABLE OF CONTENTS

I.  STATEMENT PURSUANT TO RULE 56.2 ................................................................1

II.  ISSUES OF LAW PRESENTED ........................................................................2

III. OVERVIEW OF EAPA PROCEEDINGS ...........................................................2

IV. STATEMENT OF FACTS .................................................................................4

V.  SUMMARY OF ARGUMENT ..........................................................................7

VI. STANDARD OF REVIEW ...............................................................................10

VII. ARGUMENT .................................................................................................11

  A.  The Application of Adverse Inferences to Kingtom and the Importers was Arbitrary and Capricious and Not in Compliance with Section 517(c)(3).............................................11

    1.  There Are No Actual Discrepancies and the Initial Determination Mischaracterizes the Record ........................................................................................13

    2.  Kingtom Complied To The Best Of Its Abilities........................................23

    3.  The Information That CBP Selected With Adverse Inferences Are Not Evidence of Evasion ........................................................................................28

  B.  ORR's Determination Was Arbitrary and Capricious and Not in Compliance With Section 517 ........................................................................................33

  C.  CBP Violated Kingtom's Constitutional Right to Due Process ...........................37

    1.  TRLED's Interim Measures Did Not Afford the Minimal Protections of Due Process ........................................................................................38

    2.  CBP Failed to Provide Kingtom With the Opportunity to Respond to The Initial Determination ........................................................................................42

VIII.  CONCLUSION..............................................................................................45

14929191 v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Committee v. United States,*
   882 F. Supp. 2d 1366 (Ct. Int'l Trade 2012) ..................................................33

*Aimcor v. United States,*
   23 C.I.T. 1000, 86 F. Supp. 2d 1248 (Ct. Int'l Trade 2000)...........................34

*Am. Frozen Food Inst. v. United States,*
   855 F. Supp. 388 (Ct. Int'l Trade 1994) .........................................................39

*Bloom v Hartford Life and Accident Ins. Co.,*
   338 Fed. Appx. 498 (6th Cir. 2009)................................................................30

*Changzhou Trina Solar Energy Co. v. United States,*
   195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ..............................................13, 28

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985).........................................................................................37

*Corus Group PLC v. Bush,*
   217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ..................................................39

*CPC Int'l v. United States,*
   896 F. Supp. 1240 (Ct. Int'l Trade 1995) .......................................................39

*Diamond Sawblades Mfrs. Coalition v. United States,*
   966 F.3d 1351 (Fed. Cir. 2021) ......................................................................32

*Edison Co. v. NLRB,*
   305 U.S. 197 (1938).........................................................................................10

*Global Aluminum Distrib. LLC v. United States,*
   2021 Ct. Intl. Trade LEXIS 136 (Ct. Int'l Trade 2021).................................39

*Hubbell Power Systems Inc. v. United States,*
   365 F. Supp. 3d 1302 .......................................................................................27

*Hyundai Heavy Indus. Co. v. United States,*
   485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) ..............................................26, 32

*Kwo Lee, Inc. v. United States,*
   24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ................................................39, 41

14929191 v1

*Linyi Chengen Import and Export Co. Ltd. v. United States*
   391 F. Supp. 3d 1283, 1293 (Ct. Int'l Trade 2019) ............................................25, 27

*Mannesmannrohren-Werke A.G. v. United States*
   77 F. Supp. 2d 1302, 1315 (Ct. Int'l Trade 1999) ....................................24, 25, 27

*Motor Vehicle Mfrs. Ass'n v. State Farm* 463 U.S. 29 (1983) ...................................10

*National Nail Corp. v. United States,*
   390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ...........................................................13

*NEC Corp. v. United States,*
   151 F.3d 1361 (Fed. Cir. 1998) ...............................................................................37

*Nippon Steel Corporation v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) ...............................................................11, 12, 26

*Norman v. U.S. Dep't Labor,*
   2015 WL 4771443 (E.D. Tenn. 2015) ...............................................................31, 33

*Pro-Team Coil Nail Enter. v. United States,*
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ...........................................13, 15, 17

*PSC VSMPO-Avisma Corp. v. United States,*
   688 F.3d 751 (Fed. Cir. 2012) .................................................................................37

*SeAH Steel Vina Corp. v. United States,*
   950 F.3d 833 (Fed. Cir. 2020) .................................................................................10

*Shantou Red Garden Foodstuff Co. v. United States,*
   815 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ..........................................................24

*Shelter Forest Int'l Acquisition, Inc. v. United States,*
   497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) .....................................................40, 41

*SKF USA, Inc. v. United States,*
   630 F.3d 1365 (Fed. Cir. 2011) ...............................................................................33

*SolarWorld Ams., Inc. v. United States,*
   962 F.3d 1351 (Fed. Cir. 2020) ...............................................................................33

*Sumecht NA, Inc. v. United States,*
   399 F. Supp. 3d 1370 (Ct. Int'l Trade 2019) .....................................................40, 41

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
   818 F. Supp. 348, 17 C.I.T. 146 (1993) ..................................................................30

*Trust Chem. Co. v. United States,*
   791 F. Supp. 3d 1257 (Ct. Int'l Trade 2011) ..........................................................33

iii

*Usinor Sacilor v. United States*,
   872 F. Supp. 1000 (Ct. Int'l Trade 1994) ............................................................24

**Statutes**

5 U.S.C. § 704 ............................................................................................................2

19 U.S.C. § 1517(a)(5) ...............................................................................................3

19 U.S.C. § 1517(c) ..................................................................................................10

19 U.S.C. § 1517(c)(1)(A) ........................................................................................11

19 U.S.C. § 1517(c)(3) ..............................................................................................27

19 U.S.C. § 1517(c)(3)(A) ..................................................................................11, 12

19 U.S.C. § 1517(c)(3)(C) ........................................................................................13

19 U.S.C. § 1517(f)(1) .................................................................................11, 42, 43

19 U.S.C. § 1517(g) ....................................................................................................2

19 U.S.C. § 1517(g)(2) ..............................................................................................10

19 U.S.C. § 1677e(b)(1) ............................................................................................12

19 U.S.C. § 4033(b)(2)(A) ........................................................................................29

Trade Facilitation and Trade Enforcement Act of 2015, 130 Stat. 122, 161 (2016) ......................2

**U.S. Constitution**

U.S. Const. amend. V ..........................................................................................37, 44

**Regulations**

19 C.F.R. § 165.1 ..........................................................................................42, 43, 44

19 C.F.R. § 165.6(a) ..................................................................................................11

19 C.F.R. § 165.6(b) ..................................................................................................13

19 C.F.R. § 165.11(a) ..................................................................................................3

19 C.F.R. § 165.12 ......................................................................................................3

19 C.F.R. § 165.15 ......................................................................................................3

19 C.F.R. § 165.15(d) ..................................................................................................3

iv

19 C.F.R. § 165.15(d)(1) ...................................................................................................4

19 C.F.R. § 165.22 ............................................................................................................4

19 C.F.R. § 165.24(a) ........................................................................................................3

19 C.F.R. § 165.24(b) ........................................................................................................4

19 C.F.R. § 165.27 ............................................................................................................4

19 C.F.R. § 165.41(a) ..................................................................................................42, 43

19 C.F.R. § 165.41(d) ........................................................................................................4

19 C.F.R. § 165.45 ............................................................................................................4

19 CFR §351.225(l)(2) ....................................................................................................40

**Other Authorities**

*Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81
    Fed. Reg. 56,477 (Aug. 22, 2016) ............................................................................3

THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE RICHARD K. EATON, SENIOR JUDGE

_____

| | |
|---|---|
| GLOBAL ALUMINUM DISTRIBUTOR LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| HIALEAH ALUMINUM SUPPLY, INC., | ) |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| KINGTOM ALUMINIO S.R.L. | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| TA CHEN INTERNATIONAL, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**NON-CONFIDENTIAL**
Proprietary Information
Removed from
Pages 14 to 18, 20 to 23,
26 to 31, and 35

Consol. Ct. No. 21-00198

_____

**BRIEF OF PLAINTIFF-INTERVENOR KINGTOM ALUMINIO S.R.L.**
**IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff-Intervenor Kingtom Aluminio S.R.L. ("Kingtom") files this brief in support of its Rule 56.2 motion for judgment on the agency record.  As discussed below, the U.S. Customs and Border Protection's ("CBP") determinations are an abuse of discretion, arbitrary and capricious, and otherwise not in accordance with law.

**I.   STATEMENT PURSUANT TO RULE 56.2**

The administrative determinations under review are the Initial Determination issued by CBP's Office of Trade, Trade Law Enforcement Directorate ("TRLED"), C.R. 463, and the Final Determination issued by CBP's Office of Trade, Office of Regulation and Rulings ("ORR"),

1

pursuant to 19 U.S.C. § 1517(g).  P.R. 318.[1]  The Determinations were issued on November 2, 2020, and March 18, 2021, respectively.  Neither Determination was published in the Federal Register.

In addition, pursuant to the Administrative Procedures Act, 5 U.S.C. § 704, preliminary, procedural, and intermedia agency actions and rulings that are not directly reviewable are subject to the review alongside the final agency action.

## II.   ISSUES OF LAW PRESENTED

1.   Whether TRLED improperly applied adverse inferences in lieu of using facts on the record where Kingtom complied to the best of its ability with TRLED's requests for information?

2.   Whether ORR's determination that the importers entered covered merchandise through evasion was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law?

3.   Whether CBP violated Kingtom's constitutional right to due process and the Administrative Procedure Act by failing to notify Kingtom of the existence of the investigation, not providing Kingtom the opportunity to fully participate in the proceeding, and preventing it from responding to the evidence presented against it?

## III.   OVERVIEW OF EAPA PROCEEDINGS

In February 2016, Congress enacted the Trade Enforcement and Facilitation Act, which included a section referred to as the Enforce and Protect Act ("EAPA").  *See* Trade Facilitation

---

[1] This brief cites to the Confidential Record Document ("C.R.") where a confidential version is available.  Where there is no confidential version of a document, this brief cites to the Public Record Document ("P.R.").  Where there is a confidential version of a document and the public version is relevant to the discussion, this brief will cite to the C.R. and the P.R. document number.

2

and Trade Enforcement Act of 2015, 130 Stat. 122, 161 (2016).  EAPA conferred onto CBP new

authority to investigate whether importers have engaged in "evasion" of antidumping ("AD")

and/or countervailing duty ("CVD") orders by entering merchandise subject to AD/CVD orders

by means of a material false statement or omission that results in the merchandise being entered

without payment of the applicable AD/CVD duties or security therefor. 19 U.S.C. § 1517(a)(5).

Pursuant to authority provided in the statute, CBP promulgated interim EAPA regulations on

August 22, 2016. *Investigation of Claims of Evasion of Antidumping and Countervailing Duties*,

81 Fed. Reg. 56,477 (Aug. 22, 2016).

   In an EAPA investigation, an alleging party, almost always one or more of the accused's

competitors, submits to TRLED a secret allegation of evasion against a U.S. importer.  19 C.F.R.

§ 165.11(a).  The allegation, or even the fact that an allegation has been made, is not disclosed to

the importer. *See* 19 C.F.R. § 165.15(d). CBP reviews the allegation and "acknowledges receipt."

19 C.F.R. § 165.12.  Following this acknowledgement of receipt, TRLED determines whether to

initiate an EAPA investigation within fifteen days based only on whether the allegation

"reasonably suggest{s}" that evasion could be taking place.  19 C.F.R. § 165.15.  No notice of

the initiation of the investigation is provided to the importer at that time. *See* 19 C.F.R. §

165.15(d).

   Following initiation, TRLED may request further information from the alleger, and

thereafter conducts a secret investigation of the accused importer.  After 90 days, TRLED

determines whether a "reasonable suspicion" of evasion exists.  19 C.F.R. § 165.24(a).  If

TRLED finds such reasonable suspicion it determines whether to impose crippling "interim

measures" that often include requiring live entry procedures, retroactive suspension of

liquidation, and the requirement for the importer to post cash deposits at the AD/CVD rate

alleged to be applicable to the merchandise. *See* 19 C.F.R. § 165.24(b). The importer is not

notified of the existence of the investigation until *after* TRLED has already made a determination

of reasonable suspicion of evasion and imposed the interim measures. *See* 19 C.F.R. §

165.24(b); 19 C.F.R. § 165.15(d)(1). The interim measures normally require the posting of cash

deposits for all unliquidated entries retroactive to the beginning of the investigation period, *i.e.*,

one year prior to the date the investigation is initiated. *See, e.g.*, C.R. 174 at 2 n.8 ("Notice of

Initiation"). At the time it notifies the importer of the investigation TRLED also provides to the

importer redacted versions of the EAPA allegation and memorandum initiating the investigation.

Within 300 or 360 (if extended) days after the initiation of the investigation, 19 C.F.R. §

165.22, TRLED determines whether there is substantial evidence of evasion of the AD/CVD

order(s). 19 C.F.R. § 165.27. Following TRLED's determination, the alleger and the accused

have 30 business days in which to request that ORR review the TRLED determination. 19 C.F.R.

§ 165.41(d). ORR is to review the determination de novo, taking into account the entire record

with respect to the determination. 19 C.F.R. § 165.45. Sixty business days after the receipt of

the request for review, ORR determines whether substantial evidence supports TRLED's finding

of evasion. *Id.*

## IV.    STATEMENT OF FACTS

Kingtom was established in 2016 in a free trade zone in the Dominican Republic. From

2017 onward, Kingtom progressively ramped up its operations, producing more aluminum

extrusions as more machines, personnel, and raw materials became available, and as Kingtom

began forging new relationships with its customers. By late 2019, Kingtom grew into one of the

largest aluminum extrusion producers in the Gulf region.

Between March 2018 and December 2018, representatives from Florida Aluminum

Extrusion, LLC ("Florida"), Global Aluminum Distributor, LLC ("Global"), and Hialeah

4

Aluminum Supply, Inc. ("Hialeah") (collectively "Importers") conducted site visits of Kingtom's production facility to see their supplier's operations. *See* C.R. Docs. 438-439 ("Global Supplemental RFI Response"); C.R. 420 at 2 ("Florida Supplemental RFI Response"); C.R. 421 at Appendix F ("Hialeah Supplemental RFI Response").

In early 2019, Kingtom contacted Ta Chen International, Inc. ("Ta Chen" or "Alleger"), the U.S. subsidiary of a Taiwanese aluminum distributor, about its relationships with aluminum raw material suppliers to continue accumulating reliable sources of raw materials. C.R. 1 at Exhibit 1, Attachment 1 ("Supplemental Allegation"). On June 6, 2019, Ta Chen conducted a site visit of Kingtom's facility. *See id.* at Exhibit 1. On July 11, 2019, Ta Chen filed an EAPA allegation ("Initial Allegation"). *See* Notice of Initiation. By phone, CBP requested that Ta Chen revise deficiencies in the Initial Allegation. The Initial Allegation, the follow-up phone call, and any subsequent submissions by Alleger that predated what CBP considers the Supplemental Allegation, were not provided in any form to Kingtom or the Importers. *See id.* Indeed, none of these materials, confidential or public, are part of the administrative record provided by CBP to this Court.

On July 31, 2019, before initiating an investigation, or even acknowledging receipt of an allegation, CBP conducted a site visit of Kingtom's facility under the pretext of a DR-CAFTA verification. *See* C.R. 172 ("Attaché Report"). CBP did not provide Kingtom or the Importers a public summary of the site visit, but Kingtom documented the date of the government's visit.

On August 22, 2019, the Alleger filed the Supplemental Allegation, alleging that the Importers evaded the AD/CVD Orders on Aluminum Extrusions from the People's Republic of China by importing aluminum extrusions from Kingtom. *See* Supplemental Allegation. CBP acknowledged receipt of the supplemental allegation on October 9, 2019 and, on October 31,

5

2019, initiated EAPA Consolidated Case No. 7348 with regard to the Importers.  *See* Notice of Initiation at 5.

On February 19, 2020, CBP sent requests for information ("RFI") to Kingtom and the Importers.  Kingtom timely submitted its RFI Response on March 13, 2020.  C.R. 175 ("Kingtom RFI Response").  In its response, Kingtom explained the production capacity of its equipment, C.R. 240, provided daily extrusion production records for its extrusion machines, C.R. 243, and listed its suppliers and all the materials they provided.  C.R. 175; C.R. 247.  On June 3, 2020, CBP issued a supplemental RFI to Kingtom, to which it timely responded on June 17, 2020. C.R. 416 ("Kingtom Supplemental RFI Response"). In its response, Kingtom reported its theoretical production volumes based on the daily production records and its monthly export and local sales information.  C.R.  397; C.R.  403.

On November 2, 2020, CBP issued its initial determination of evasion, finding that Kingtom was able to produce aluminum extrusions in the Dominican Republic, but that Kingtom's failure to submit accurate information and cooperate to the best of its ability meant that CBP was unable to determine that Kingtom actually did produce all of the aluminum extrusions it sold.  *See* Initial Determination at 17.  Based on this finding, as well as the citizenship of Kingtom's management, CBP found as an adverse inference that all merchandise entered to the United States by the Importers contained co-mingled Chinese- and Dominican Republic-origin aluminum extrusions.  On November 17, 2020, Kingtom requested that CBP provide Kingtom with a version of the Initial Determination that did not redact Kingtom's own information so that it could respond to the Initial Determination.  *See* Letter from Morris, Manning & Martin, LLP, to Scott Hoefke and Rebekah Kass, CBP, "EAPA Cons. Case No.

7348: Request for Release of Certain Information" (Nov. 18, 2020). The Importers also filed

such requests, P.R. 287-292, but none of these requests were granted.

Thereafter, on December 16, 2020, Kingtom and the Importers filed requests for

administrative review, in which they argued that TRLED's application of adverse inferences was

unjustified, that CBP had violated their due process rights by not providing adequate public

summaries, and that TRLED's identification of "deficiencies" in the submitted responses by and

large stemmed from misunderstandings and mischaracterizations of the submitted

documentation. C.R. 464-466, 469. While CBP accepted the Importers requests for

administrative review, CBP rejected Kingtom's request for administrative review because

Kingtom was not a "party to the investigation." P.R. 301.

On March 18, 2021, ORR determined that the record does not support a determination

that Kingtom produced all of the extrusions it exported to the United States. *See* P.R. 318. ORR

further postulated that the application of adverse inferences was unnecessary to find evasion

here, as according to ORR, Kingtom's production records did not reasonably relate to the

volumes it was exporting. *Id.* at 13. ORR further disregarded the site visits from the individual

importers as they did not address Kingtom's overall capabilities, but were simply meant to

determine whether Kingtom would be able to fill the orders for the individual importer. *Id.* at 12.

Finally, despite "not relying on adverse inferences," ORR pointed to the citizenship of

Kingtom's management as support for its finding that some of Kingtom's produced extrusions

were also from China. *Id.* at 12-13.

This appeal followed.

## V.    **SUMMARY OF ARGUMENT**

Neither TRLED nor ORR in their respective determinations make any actual finding of

evasion. More specifically, neither identify any affirmative evidence that any of the aluminum

extrusions exported to and entered by the Importers were China-origin.  Indeed, CBP did not identify any evidence, let alone substantial evidence, that Kingtom was transshipping China-origin extrusions.

Rather than make such a finding, TRLED determined that alleged "discrepancies" in Kingtom and the Importers' submissions, along with Kingtom's "ties to China," justified the application of adverse inferences.  However, the application of adverse inferences is not appropriate where, as here, the responding party complies with requests for information to the best of its ability.  The basis of the responding party's nationality is not a relevant consideration. Here, Kingtom provided voluminous documentation across multiple responses, including documentation included in Importer responses.  Nonetheless, TRLED misunderstood or mischaracterized submitted materials as an excuse to disregard them, while simultaneously claiming that the information within those submitted materials was not provided.  TRLED pointed to the resulting "discrepancies" as permitting it to conclude that, because Kingtom's owners and management are from China, the extrusions that Kingtom sells must also be from China.  To claim that Kingtom failed to comply to the best of its ability based on TRLED's misunderstanding of or simple disregard for Kingtom's submitted materials, and instead relying as an adverse inference on the nationality of Kingtom's ownership and management, is arbitrary and capricious and must be reversed.

Like TRLED, ORR did not identify any affirmative evidence of transshipment or evasion, and instead pointed to vague "discrepancies" that purportedly demonstrated that Kingtom did not operate at 100 percent capacity.  ORR concluded that because Kingtom did not operate at 100 percent capacity, it too could rely on the nationality of Kingtom's owners and management as evidence of evasion.  Unlike TRLED, ORR concluded that this alone constituted

8

substantial evidence of evasion and that the application of adverse inferences is not required to make an affirmative evasion finding in this case. This is incorrect and a misapplication of the substantial evidence standard, which requires *some* evidence of evasion, not vague and unsupported assertions. While TRLED attempted to circumvent this requirement by relying on adverse inferences, ORR provided no such justification. As ORR failed to correctly apply the substantial evidence standard, its determination should be reversed as arbitrary, capricious and otherwise not in accordance with law.

In addition, CBP violated Kingtom's constitutional right to due process, which required that Kingtom have the opportunity to be presented with and respond to evidence against it so that it can have a meaningful opportunity to be heard. In particular, CBP imposed interim measures against Kingtom and the Importers before they were even notified of the existence of the investigation. The Interim Measures, which imposed the obligation to post cash deposits of AD/CVD duties equal to 93.38% of the entered value of the goods on all of the Importers' entries of Kingtom-produced aluminum extrusions, effectively prevented the Importers from purchasing from Kingtom, harming Kingtom's reputation and business prospects, and preventing Kingtom from fulfilling the terms of its contracts. Given these deprivations, due process required that Kingtom and the Importers be provided notice of, and have the opportunity to respond to, the allegations Ta Chen presented against them prior to such punitive measures being imposed. CBP's failure to do so was an unlawful violation of due process and should be reversed.

Finally, after TRLED's Initial Determination, ORR denied Kingtom the ability to respond to the Initial Determination, which included numerous findings against it as well as the above-discussed unsubstantiated claim of non-cooperation. ORR's failure to permit Kingtom to

9

respond to the Initial Determination and to participate in the administrative review of TRLED's

Initial Determination violated Kingtom's right to due process, *i.e.*, the opportunity to be heard,

and should be reversed.

## VI.    **STANDARD OF REVIEW**

The Court is to examine Custom's determinations in two respects:  (A) whether Customs

complied with all procedures set forth in the statutory provisions covering EAPA investigations

and reviews, and (B) whether any determination, finding, or conclusion is arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1517(g)(2).

Pursuant to the arbitrary and capricious standard, the Court must determine whether CBP

examined the relevant data and "articulated a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n.*,

463 U.S. 29, 43 (1983) (internal citations omitted).  CBP's determination is arbitrary and

capricious if it "relied on factors which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Id.*

In conducting its investigation, TRLED was to determine whether substantial evidence

supports a finding that an accused importer evaded an AD antidumping or CVD countervailing

duty order. 19 U.S.C. § 1517(c).  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938).  "Substantial evidence 'must do more than create a suspicion of the existence of the fact

to be established.'"  *SeAH Steel Vina Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020).

10

In conducting its administrative review of such a decision, ORR, was to review *de novo* the determination of TRLED, reapplying the same evidentiary standard.  19 U.S.C. § 1517(f)(1).

## VII.    ARGUMENT

### A.  The Application of Adverse Inferences to Kingtom and the Importers was Arbitrary and Capricious and Not in Compliance with Section 517(c)(3)

The record does not support CBP's finding that Kingtom failed to comply with a request for information or that the "discrepancies" CBP identifies resulted in sufficient lack of information regarding Kingtom's production.  Additionally, the facts otherwise available on which CBP relied upon are not substantial evidence of evasion because there is no evidence on the record that Kingtom ever purchased aluminum extrusions from China.  *See* 19 U.S.C. § 1517(c)(1)(A).  CBP's application of adverse inferences to Kingtom is, therefore, unsupported by the record and unlawful pursuant to 19 U.S.C. § 1517(c)(3)(A).

Section 517(c)(3)(A) of the Tariff Act permits CBP to "use an inference that is adverse to the interests" of a party if that party "has failed to cooperate by not acting to the best of {its} ability to comply with a request for information."  19 U.S.C. § 1517(c)(3)(A); 19 C.F.R. § 165.6(a).  While the EAPA statute does not provide a definition for "acting to the best of its ability," the Federal Circuit defined the standard in the context of U.S. Department of Commerce ("Commerce") AD/CVD proceedings in *Nippon Steel Corporation v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

In *Nippon*, the Federal Circuit clarified that, when an agency analyzes whether a party has acted to the "best of its ability," the agency must assess the party's abilities, efforts and cooperation in responding to requests to determine whether it has "put forth its maximum effort" to provide "full and complete answers to all inquiries."  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "The standard does not require perfection and recognizes

11

that mistakes sometimes occur." *Id.*  The Federal Circuit thus established a two-part test for the

agency:

> First, it must make an objective showing that a reasonable and responsible
> importer would have known that the requested information was required to be
> kept and maintained under the applicable statutes, rules, and regulations. . . .
> Second, {the agency} must then make a subjective showing that the respondent
> under investigation not only has failed to promptly produce the requested
> information, but further that the failure to fully respond is the result of the
> respondent's lack of cooperation in either: (a) failing to keep and maintain all
> required records, or (b) failing to put forth its maximum efforts to investigate and
> obtain the requested information from its records. An adverse inference may not
> be drawn merely from a failure to respond, but only under circumstances in which
> it is reasonable for {the agency} to expect that more forthcoming responses
> should have been made; i.e., under circumstances in which it is reasonable to
> conclude that less than full cooperation has been shown.

*Id.* at 1382-83 (internal citations omitted).

The principles and rationale behind the application of adverse inferences in proceedings

conducted by Commerce, as delineated by the Federal Circuit in *Nippon Steel*, reasonably apply

to EAPA investigations, as the same language authorizes the application of adverse inferences in

both AD and CVD proceedings and evasion investigations.  Both Section 517 and Section 776

read as follows:  "if the {agency} finds that {a party} has failed to cooperate by not acting to the

best of {its} ability to comply with a request for information, the {agency may} use an inference

that is adverse to the interests of that party in selecting from the facts otherwise available."  19

U.S.C. § 1517(c)(3)(A); 19 U.S.C. § 1677e(b)(1).  Therefore, as there is not yet an established

body of law specifically addressing the application of adverse facts available ("AFA") in the

EAPA context it is reasonable to look to the courts' interpretations of the AFA statute in the

context of Commerce's application as a guide.

According, only if substantial evidence supports that a party failed to cooperate to the

best of its ability, may CBP "use an inference adverse to the interests of that party . . . in

selecting from the facts otherwise available." 19 U.S.C. § 1517(c)(3)(A).  In EAPA

investigations, the adverse inference selected "may include information derived from: (i) the

allegation," (ii) another evasion determination, or "any other available information."  19 U.S.C. §

1517(c)(3)(C);  19 C.F.R. § 165.6(b).  Therefore, CBP may not assume whatever facts it wants.

"Even when using facts otherwise available with adverse inferences, an agency must still point to

actual information on the record to make required factual determinations."  *See Changzhou Trina*

*Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1350 (Ct. Int'l Trade 2016).  In other

words, CBP may not "bypass the prerequisite factual findings to reach a legal conclusion," as it

has an obligation "to make determinations that are supported by a reasonable reading of the

record, including consideration of relevant evidence that 'fairly detracts' from the reasonableness

of its conclusions."  *Id.* at 1350 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488

(1951)).  The purpose of adverse inferences is to incentivize cooperation with requests for

information, *National Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1374 (Ct. Int'l Trade

2019), and not to punish those from whom information is requested, *see Pro-Team Coil Nail*

*Enter. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019).

### 1.  There Are No Actual Discrepancies and the Initial Determination Mischaracterizes the Record

CBP applied adverse inferences to Kingtom and the Importers on the grounds that there

were numerous alleged discrepancies in Kingtom and the Importers' questionnaire responses.

C.R. 463 at 17.  However, in most instances, there were not actually any discrepancies on the

record and CBP, at best, misunderstood record information or, at worst, mischaracterized it.  For

example, CBP relies on a "discrepancy" by between the amount of ingot and scrap that Kingtom

allegedly "used" with the quantity of aluminum extrusions that Kingtom *produced* to find a

discrepancy regarding Kingtom's production.  More specifically, CBP claims that that Kingtom

could not have produced the amount of extrusions it reported using that amount of ingot and

13

NON-CONFIDENTIAL

scrap.  But the record actually reflects that the ingot and scrap amounts to which CBP referred are actually the quantities *purchased*, not *used*, and therefore do not have a direct correlation to the amount of aluminum extrusions produced by Kingtom.  *See* C.R. 463 at 13, Table 4; C.R. 469 at 17.  There was no actual discrepancy and therefore no basis to find that Kingtom failed to cooperate by accurately reporting its production.  To the extent any actual discrepancies do exist they would be minor errors of a ministerial nature that would not evidence a failure on the part of Kingtom or the Importers to comply to the best of their abilities.

The alleged discrepancies identified in the Initial Determination can be categorized into: (a) production capacity, (b) production, (c) supplier transactions, and (d) other miscellaneous issues.  As none of the alleged discrepancies demonstrate that Kingtom or the importers failed to cooperate to the best of their abilities, CBP's determination to the contrary is unreasonable.

### a.  The Record is Clear Regarding Kingtom's Production Capacity and Kingtom Did Not Fail to Respond to Requests for Such Information

Kingtom reported its equipment to CBP, including the [          ] extrusion presses that Kingtom had throughout the entirety of the period of investigation ("POI"), and the extrusion presses that Kingtom acquired during the POI.  C.R. 240.  In its initial RFI response, Kingtom estimated the monthly production capacity of its equipment to be at least [

].  C.R. 240; C.R. 469 at 9 n.53.[2]  In its supplemental RFI response, Kingtom provided documentation from the equipment supplier attesting to the production capacity of the equipment, and reported a daily production capacity that, when

_____

[2] Note that in footnote 72 of the Initial Determination, CBP uses a conversion factor of [                                        ], but later in its determination at footnote 90 CBP uses a conversion factory of 2204.6226 pounds per metric ton.  C.R. 463 at 10 n.72, 13 n.90.  In its request for administrative review, Kingtom's counsel used the conversion factor that the Government publicly disclosed, 2204.6226, to approximate Kingtom's monthly production capacity at [                              ].  C.R. 469 at 9 n.53.

14

NON-CONFIDENTIAL

multiplied by an estimated number of operating days per month, exceeded Kingtom's initial estimates.  C.R. 394; C.R. 416 at 34-35.

CBP claims that the lack of clarity on actual production capacity means that CBP "cannot determine what Kingtom's true production capacity is" and that this is an example of Kingtom's failure to cooperate to the best of its ability.  But CBP's explanations of the alleged discrepancies with respect to reported capacity are nonsensical.  C.R. 463 at 11.  CBP fixates on its belief that Kingtom should have been operating at a higher capacity than it appeared to be during the site visits by CBP and Ta Chen.  *Id.*  CBP calculates a capacity utilization ratio between [

] by allegedly taking Kingtom's reported sales volume as a percent of its production capacity for certain months, and then contrasts these ratios with the alleged [                                    ] during the visits, and therefore assumes that Kingtom's reported capacity figures are flawed.  *Id.* at 10-11.

Contrary to CBP's claims, this is not evidence of "a lack of clarity on production capacity."  As an initial matter, the information from the site visits represents generalized observations of Kingtom's production and is limited only to the moment the observations at the facility occurred.  It is not indicative of Kingtom's monthly production volumes, its overall production capacity, or its actual production at any other time, especially given the years of documented production on the record.  *See, e.g.*, C.R. 397; C.R. 243.  In fact, CBP acknowledged the limitation of the site visit reports:  ORR found that the importers' site visits provided no indication regarding Kingtom's overall production.  P.R. 318 at 12.  The same can be said of CBP's site visit, as there is no indication in the Attaché Report that CBP sought or obtained records regarding Kingtom's overall production capacity during that visit.  C.R. 173.

15

NON-CONFIDENTIAL

Furthermore, CBP's analysis does not make mathematical sense. CBP cites the capacity of the production equipment that Kingtom reported in its equipment list — approximately [          ] pounds per month — and then states that Kingtom should have been operating at [       ] or [               ] capacity during the months of the site visits. In CBP's view, the fact that little production was observed on the site visits proves that Kingtom's reported production capacity is wrong. This is demonstrably false. Record evidence shows that Kingtom's total sales during [           ] (Alleger's visit) amounted to [          ] of its reported capacity, while its total sales in [        ] were [          ] of its reported capacity. It is therefore clear that CBP's view is incorrect. C.R. 463 at 10, 11 n.73; C.R. 173. Moreover, CBP's basis for comparison — comparing Kingtom's monthly production capacity with its monthly sales volume — is flawed. These values are not directly comparable as Kingtom does not sell or ship all the extrusions it produces in the same month. C.R. 469 at 16.

Operated at [           ], as Kingtom did in [           ], Kingtom could have shutdown operations completely for [     ] days of the month and still had a production volume equal to its monthly sales. It is thus not reasonable for CBP to conclude that Kingtom *must* have been operating at a "high" rate of production on the particular day of the site visit. CBP also points out that [

                                                            ] to support its conclusion that CBP "officials found [              ] production" at the site visit. C.R. 463 at 10. In other words, CBP points to the [                                    ] to conclude that Kingtom had "[        ]" *extrusion* production. Given that CBP found that Kingtom

16

NON-CONFIDENTIAL

operated at least [          ] during each of the facility tours for an

operating capacity at the time of at least [          ], this conclusion is illogical on its face.  *Id.*

        CBP fails to explain how the alleged comparison between Kingtom's reported production

capacity and the [                    ] production observed at the site visits demonstrates that

Kingtom failed to cooperate to the best of its ability with a request for information.  *Id.* at 11.

CBP implies that as a result of "discrepancies" between the site visit production and the reported

production capacity, "CBP cannot determine what Kingtom's true production capacity is" and

that this is an "example of Kingtom's failure to cooperate."  *Id.*  CBP's site visit occurred before

any RFIs were issued and, importantly, CBP's site visit was not a verification of any requested

information.  C.R. 173.  The Attaché Report does not note conflicting records or findings other

than generalized observations that do not call into question the veracity of Kingtom's responses

or its reported production.  As a result, the site visits do not demonstrate that Kingtom failed to

cooperate with any request for information.

        **b.  Kingtom Properly Reported its Production Volumes and How Those Volumes Were Calculated**

        Kingtom reported its production records as maintained in the ordinary course of business

and totaled its monthly production as requested by CBP.  C.R. 243; C.R. 397.  The Initial

Determination takes issue with Kingtom's reported production because (1) Kingtom's sales

volume allegedly exceeds its theoretical production volume and (2) Kingtom's theoretical

production volume "make no sense" in that there is allegedly no explanation of Kingtom's

calculation or supporting daily production records.  C.R. 463 at 12-13.  However, CBP ignores

the actual daily production data that Kingtom submitted and totaled to derive its theoretical

production, which undisputedly exceeded its sales.  Furthermore, CBP fails to mention, or even

17

NON-CONFIDENTIAL

list, the months in which Kingtom's production *exceeded* its sales and ignores the fact that

Kingtom's total production for the POI *exceeded* its total sales.  *Id.* at 12.

Moreover, CBP's Initial Determination selectively lists *only* the months for which

Kingtom's theoretical production did not exceed its sales while *omitting* Kingtom's production in

other months.  *Id.*  Kingtom's reported data, as summarized in Exhibit S-18,[3] shows that

Kingtom produced [            ] pounds of aluminum extrusions and sold [            ]

pounds,[4] demonstrating that Kingtom's production volume exceeded its sales volume, contrary

to the mischaracterization in the Initial Determination.  C.R. 397.

The Initial Determination concludes that Kingtom must ship [            ] of the

extrusions extruded in a month by the end of the same month because Kingtom produces to

customer specifications and thus does not maintain an inventory since there is no catalog of

finished products.  C.R. 463 at 13.  This conclusion ignores all production steps subsequent to

extrusion and fails to explain how Kingtom could further process, pack, and ship all of its

monthly production the same month it is produced.  *Id.*  As there are sample sales on the record

that are produced in one month and shipped in another month, CBP should be aware of such

extrusion-to-sale delays.  C.R. 469 at 16; C.R. 175 at Exhibit 2.  In addition, there is no reason

for CBP to assume that Kingtom cannot extrude profiles to fill an order in two distinct months if

it were to start extruding the order at the end of a particular month.  Moreover, once Kingtom has

worked with its customers to design an extrusion, the customer may order extrusions of that

design without needing to redesign the customized specification for each subsequent order.

CBP's assumption that Kingtom maintains no "catalog" is therefore irrelevant.  C.R. 469 at 17.

_____

[3] CBP incorrectly cites Exhibit S-16, but uses S-18.  C.R, Doc 463 at 12 n.84.

[4] [                                    ].

Indeed, Kingtom informed CBP at its site visit that it stores aluminum extrusions for sale.  C.R. 173.

CBP unreasonably dismisses the daily production records that Kingtom actually submitted, which demonstrate the calculation of its monthly theoretical production.  C.R. 243. CBP's only explanation as to why it could not rely on Kingtom's reported production records is because they were "monthly overviews done in Excel."  C.R. 463 at 13 n.89.  This mischaracterizes what Kingtom submitted.  In the normal course of business, Kingtom records its daily production by "theoretical weight" and then totals each month's production to determine monthly theoretical production volume.  C.R. 243.  What Kingtom provided to CBP were the daily production records, which also included the monthly total.  The monthly theoretical production volumes reported in C.R. 243 were also used to report Kingtom's production summary in C.R. 397.  The theoretical production volumes in C.R. 243, once converted from kilograms to pounds, match the theoretical production volumes in C.R. 397 exactly, with the exception of a single ministerial error that Kingtom affirmatively disclosed to CBP.  C.R. 466 at 11-12 & n.46.  CBP never indicated that the daily production records submitted by Kingtom were insufficient nor did it request any different presentation of the production data.  It is disingenuous to disregard the information submitted by Kingtom while claiming that the lack of such information on the record demonstrates Kingtom's non-compliance.

### c.  Kingtom Provided the Identity of Its Suppliers and the Materials They Provided as Requested

CBP notes as evidence of Kingtom's alleged failure to cooperate that (1) Kingtom did not identify which supplier provided what raw material and that (2) Kingtom did not provide proof of payment to its suppliers.  Contrary to CBP's characterization, Kingtom explained in its RFI

19

response which suppliers provided what raw materials and provided the corresponding proofs of payment.

Kingtom's RFI response at Exhibits 9 and 25 lists all of Kingtom's transactions with its suppliers and the materials supplied, and Exhibit 16 includes supporting documentation for those purchases. *See* C.R. 175 at 30; C.R. 262; C.R. 247; C.R. 190-231. Notably, Exhibit 25 lists the suppliers and materials of aluminum ingot and scrap, which make up the substantial majority of inputs for the production of aluminum extrusions[5] — CBP did not point to any record evidence contradicting the information provided regarding those suppliers listed in Exhibit 25 or the materials they supplied. C.R. 463. CBP further claims that Kingtom failed to provide a description for "[          ]" and "[          ]" and thus CBP could not be sure what the suppliers provided. *Id.* at 6. However, CBP ignores that the very exhibit cited by CBP, Exhibit 9 or C.R. 262, describes Kingtom's "[          ]" suppliers as providing [          ].

CBP also mischaracterized the record by failing to discuss the second, more detailed description column in the excel file wherein Kingtom described the materials received. C.R. 462. Kingtom's reporting of "[          ]" is reasonable and unambiguous, especially considering that Kingtom also listed its equipment in detail separately, C.R. 240, and CBP never asked which supplier provided which piece of equipment. C.R. 175; C.R. 416. While CBP notes that there are certain suppliers reported in Exhibit 9 that are not listed in Kingtom's narrative response to Question A.6, C.R. 175 at 4-7, Kingtom's RFI response as a whole, including the

---

[5] Kingtom uses [    ] kilograms of chemicals, [    ] kilograms of silicon, and [    ] kilograms of magnesium, for every [    ] kilograms of aluminum ingot or scrap consumed, and [    ] kilograms of powder for every [    ] kilograms of aluminum extrusions in powder painting. *See* C.R. 175 at 27; C.R. 255.

NON-CONFIDENTIAL

exhibits, exhaustively lists Kingtom's suppliers.  In contract, CBP cites no evidence that

Kingtom obtained inputs from a party not reported in its responses.  The record thus contains

uncontradicted evidence regarding the identity of Kingtom's suppliers and the materials they

supplied, contrary to CBP's characterization of the record.

CBP also takes issue with Kingtom supposedly failing to provide proof of payment to the

suppliers listed in Kingtom's narrative response.  *Compare* C.R. Doc 463 at 7-8, *with* C.R. 175 at

4-7.  However, CBP does not specify any transactions during the POI that lack payment

information.  Kingtom's RFI response lists "parties involved in sourcing" with which Kingtom

had a supply relationship, but does not purport to list parties for which there would necessarily

be a transaction and corresponding payment.  C.R. 175 at 4-7.  In other words, those "suppliers"

listed in Kingtom's narrative response are only parties from which Kingtom may source

materials, but are not necessarily those with actual transactions during the POI.  Exhibit 9, in

contrast with Kingtom's narrative response, listed all transactions with Kingtom's suppliers

during the POI, transactions that CBP was able to trace to Kingtom's bank statements.  C.R. Doc

463 at 7-8; C.R. 175 at 4-7; C.R. 177-180.

In short, Kingtom could not report transactions it did not make — and therefore it did not

report in Exhibit 9 transactions with the potential "sourcing" parties that it listed in the narrative

if there were no such transactions during the period of investigation.  Tellingly, CBP never asked

why the parties listed in the narrative were not in Exhibit 9.  *See* C.R. 416 at 3, 6, 11-15, 21-23.[6]

---

[6] CBP cites [                                    ] as a foreign party lacking proof of
payment, but in fact it is not a foreign party as it is located in the Dominican Republic. CBP's
request for information was limited to only *foreign* suppliers. C.R. 175 at 19. CBP was also able
to trace transactions with [                                    ], despite the
typo in the narrative omitting the first word, [                ] so CBP's finding that Kingtom failed to
report transactions therefore was arbitrary and unreasonable. C.R. 463 at 6, 8.

21

NON-CONFIDENTIAL

There are no transactions lacking proof of payment. C.R. 262. Kingtom is under no obligation to report transactions that it never made, and CBP thus had no basis to conclude that Kingtom failed to cooperate.

### d. CBP's Other Noted Discrepancies are Not Evidence of a Failure to Cooperate

The Initial Determination makes several other references to alleged discrepancies that simply do not exist or are ministerial. Additionally, CBP's failure to disclose proprietary information prevented the Kingtom and the Importers from reconciling reported information to each other's responses, and identifying potential inadvertent errors. Like the other discrepancies that Kingtom noted, these alleged discrepancies do not evidence a failure to cooperate to the extent they exist at all:

- Kingtom reported that its production process starts by casting billets from aluminum ingot and scrap, and explained that it purchases aluminum ingot exclusively from third countries, but not China. C.R. 175 at 3. However, the CBP faults Kingtom for failing to report a step in its production process — CBP found that Kingtom [      ]. C.R. 463 at 11-12. However, Kingtom does not [         ], never claimed to do so, and no [            ] was observed in CBP's site visit. C.R. 463 at 11. Additionally, Kingtom explained that it purchases its ingot from third countries other than China, C.R. 175 at 3, and provided to CBP purchase documentation for all of the imported ingots that it purchased. C.R. Docs. 190-196. CBP cannot claim that a discrepancy exists because Kingtom did not actually fail to report a production step.

- CBP notes that the site visit reports from all three importers, the Alleger, and CBP conflict. C.R. 463 at 8-11. However, all site visit reports from all parties confirmed that Kingtom had the [     ] extrusion press machines that it claimed in its equipment log, C.R. 463 at 8-10; C.R. 240, and the fact that Hialeah and the Alleger noted an extra press does not call into question the veracity of Kingtom's production capability and reporting. Additionally, Kingtom's equipment list reported the date from which the presses could be "used," not when they were acquired or installed. C.R. 240.

- The Alleger's expert claimed that Kingtom lacked sufficient raw materials for its production volume. C.R. 463 at 9. The Alleger's site visit demonstrates only that Kingtom had a certain quantity of input material *at the time of the visit* and says

22

NON-CONFIDENTIAL

nothing about Kingtom's raw material supplies on any other day or in inventory, let alone monthly production capabilities, especially given that Kingtom reported its input purchases.  C.R. Docs. 190-200; C.R. 243; C.R. 247; C.R. 379; C.R. 395. Kingtom's total purchases of ingot and scrap exceed its total production.[7]  C.R. 397. Further, Kingtom demonstrated its aluminum ingot and scrap supplies vary substantially over time.  *Id.*

- CBP attempted to bolster its finding that Kingtom and the importers failed to cooperate to the best of their abilities by cross-examining each party's responses vis-à-vis each other.  C.R. 463 at 15-16.  However, the fact that different parties reporting specifics do not reconcile exactly to each other should be expected as there are countless means by which different companies can account and record-keep differently.  Additionally, all of the compared details were confidential information belonging to the respective parties, C.R. 463 at 19-25, and the parties thus could not even attempt reconcile the respective information to determine if there were any inadvertent errors without disclosure of proprietary information.

### 2.  Kingtom Complied To The Best Of Its Abilities

As discussed above, the alleged "discrepancies" are actually mischaracterizations of responses that unreasonably describe the RFI responses in this investigation and do not evidence non-compliance.  CBP fails to point to any record evidence that any alleged discrepancies, if any do exist, are anything more than ministerial.  C.R. 469 at 5-18.  Moreover, as these are not circumstances where Kingtom or the Importers failed to provide requested information from their records or where more forthcoming responses could have been made, these alleged "discrepancies" do not evidence a failure to cooperate to the best of their ability that would justify the application of AFA.  Given that there is no evidence of non-compliance, CBP's application of AFA was contrary to law.

Kingtom provided a response to each of CBP's requests.  For example, Kingtom provided its production records as maintained in the ordinary course pursuant to CBP's express instructions.  C.R. 175 at 27, 28; C.R. 243.  Similarly, Kingtom reported the production capacity

---

[7] [                                        ] pounds of aluminum inputs is greater than the total theoretical production, [                    ] pounds of extrusions.  C.R. 397.

23

of its equipment as requested by CBP.  C.R. 175 at 26-27; C.R. 240.  Nonetheless, in both

instances, CBP found that Kingtom failed to comply with the respective requests for information

despite the full and complete answers provided.  C.R. 463 at 7, 11, 12.  In many instances other,

CBP never actually requested the information that it claims was missing from Kingtom's

responses.  For example, CBP found that Kingtom "did not provide any explanation as to how it

calculated {its theoretical production} volume, nor did it provide any explanation on how its

actual production volume exceeded its theoretical production volume." C.R. 463.  However,

CBP never requested such an explanation.  Before CBP "may find any non-compliance on the

part of the parties to the proceeding, there must be a clear and adequate communication

requesting the information." *Usinor Sacilor v. United States*, 872 F. Supp. 1000, 1010 (Ct. Int'l

Trade 1994); *see also Shantou Red Garden Foodstuff Co. v. United States*, 815 F. Supp. 2d 1311,

1318, 1324-25 (Ct. Int'l Trade 2012) ("Nothing . . . excuses Commerce from the obligation to

ensure that any findings {regarding adverse inferences} are grounded in the language Commerce

chose to communicate its information requests to an interested party.").

In *Mannesmannrohren-Werke A.G. v. United States*, Commerce found that a respondent

failed to cooperate by not acting to the best of its ability to comply with requests for information

because it allegedly failed to fully and accurately respond to two questions regarding input

purchase prices from affiliated and unaffiliated suppliers.  77 F. Supp. 2d 1302, 1315 (Ct. Int'l

Trade 1999).  The respondent provided information for purchases from affiliated suppliers but

not unaffiliated suppliers, and explained that it infrequently purchases from unaffiliated suppliers

and only does so when it needs special inputs that are higher-priced.  *Id.* at 1305-06.  At

verification, Commerce discovered input purchases from unaffiliated suppliers that were not

24

specialty inputs and accordingly determined that the respondent had not cooperated to the best of

its ability. *Id.* at 1308.

The court disagreed, holding that because Commerce had not explained how the errors

were "anything more than inadvertent omissions" this did not demonstrate the respondent

"purposefully failed to cooperate." *Mannesmannrohren*, 77 F. Supp. 2d at 1315, 1317.  The

court reasoned that the language of the statute requires a finding that the "respondent could have

complied and failed to do so," and that "omission of one or more purchases of such a relatively

small quantity could just as easily have been an oversight . . . as deliberate evasion." *Id.* at 1316.

The court explained:

> {F}ailing to respond does not have to be read negatively.  A respondent can fail to
> respond because it was not able to obtain the requested information, did not
> properly understand the question asked, or simply overlooked a particular request.
> Thus, without further explanation by Commerce, the Court will not infer that a
> respondent's failure to respond constitutes substantial evidence that it failed to
> cooperate to the best of its ability.  This is especially true where, as here, a
> respondent sought to correct its deficiencies in responding to a supplemental
> questionnaire.

*Id.*

Similarly, in *Linyi Chengen Import and Export Co. Ltd. v. United States*, Commerce

"'made observations' at verification 'that called into question the accuracy of {the respondent's}

records and its ability to substantiate such records,'" specifically finding the respondent's

"reporting of {input} quantities to be imprecise."  391 F. Supp. 3d 1283, 1293 (Ct. Int'l Trade

2019).  The court looked closely at the "perceived inconsistencies" proffered by Commerce and

found that Commerce's "multiple critiques" of the respondent's input calculations to be arbitrary

and capricious because Commerce failed "to explain how the record, particularly the verification

report and the related exhibits" supported the determination that the provided data was

unreliable. *Id.* at 1294.  The court expressly noted that the determination failed to address supporting documentation that the respondent had provided from its suppliers. *Id.* at 1294.

Like Commerce in *Mannesmannrohen* and *Linyi*, CBP does not attempt to justify how the alleged "discrepancies," to the extent they are "discrepancies" at all, evidence anything more than inadvertent error or how they demonstrate that Kingtom could have complied and failed to do so.  For example, CBP's comparison of Kingtom's production capacity with the site visits, C.R. 463 at 11, does not explain how Kingtom could have provided more forthcoming responses regarding Kingtom's production equipment and its capacity, especially in light of the fact that all of the site visit reports corroborated that Kingtom had the [          ] extrusion presses it claimed. C.R. 463 at 10 n.72; C.R. 240.  Similarly, Kingtom reported all of its production data as maintained in the ordinary course, C.R. 243, yet CBP declined to consider it because CBP considered Kingtom's recordkeeping unreliable solely because it was in Excel format, C.R. 463 at 13 n. 89.  Such conclusions ignore the question of whether Kingtom reported information as maintained in its normal books and records or whether Kingtom's ability and effort to comply met the "best of its ability" standard.  *Nippon*, 337 F.3d at 1382.  CBP's determination also fails to address many of the underlying documents provided by Kingtom or to adequately explain how Kingtom's reporting was unreliable in light of the supporting documentation that Kingtom provided for its equipment production capacity, its actual production records, and supplier source documentation.  *See Hyundai Heavy Indus. Co. v. United States*, 485 F. Supp. 3d 1380, 1401 (Ct. Int'l Trade 2020) ("The record does not support Commerce's characterization of {respondent's} reporting errors as sufficient to warrant an adverse inference {because} Commerce requested and { respondent} provided {the requested} documentation.").

26

NON-CONFIDENTIAL

CBP goes even further than Commerce in *Mannesmannrohen* and *Linyi* — CBP determined that it could not rely on any of Kingtom's responses despite the lack of actual evidence that Kingtom's responses were not full and complete.  In *Mannesmannrohen*, Commerce used facts available only as a limited aspect of the cost analysis:  to disregard affiliated input purchases and replace the purchase prices with that of the unaffiliated sale identified at verification.  *Mannesmannrohen*, 77 F. Supp. 2d at 1307.  In *Linyi*, Commerce only disregarded limited input information so that it could apply a particular intermediate input methodology.  *Linyi*, 391 F. Supp. 3d at 1290.  Here, CBP completely disregarded *all* of Kingtom's production data simply because it saw only [                                    ] running at the moment it toured Kingtom's factory.  C.R. 463 at 10.  That only [                            ] was running while CBP observed the factory does not call into the question the production information that Kingtom provided as requested or evidence less than full cooperation.  *See Hubbell Power Systems Inc. v. United States*, 365 F. Supp 3d 1302, 1308 ("Although omissions, lies, and non-cooperation have in some cases been enough to merit Commerce's choice to disregard all information, the discrepancy relied on here does not rise to the level present in such cases.").

It is apparent from the record that CBP's finding that Kingtom misreported its production or supplier information is entirely unsupported, and does not require the Court to substitute its judgment for that of CBP.  Any reasonable reading of this record as a whole and in the context of the questionnaires as communicated to Kingtom would conclude that Kingtom and the Importers put forth their maximum effort to comply with the requests as they were communicated by CBP.  CBP's application of adverse inferences failed to comply with the procedures of 19 U.S.C. § 1517(c)(3) and is arbitrary and capricious.

27

### 3.   The Information That CBP Selected With Adverse Inferences Are Not Evidence of Evasion

Even assuming *arguendo* that adverse inferences are warranted, the information that CBP

relied upon do not constitute substantial evidence demonstrating that the extrusions entered by

the Importers are Chinese-origin.  Initial Determination relies solely on the following

information:

> CBP will select from the facts otherwise available and infer that all of the
> merchandise imported to the United States by the Importers contained co-mingled
> Chinese-origin and Dominican Republic-origin aluminum extrusions. The
> information on the record supporting this fact . . . includes {(1)} Kingtom's
> establishment shortly after the AD/CVD were required on Chinese aluminum
> extrusions; {(2)} Kingtom's strong ties to Chinese companies and suppliers; {(3)}
> the lack of explanation as to what materials were sold by the [          ] suppliers
> to Kingtom; {(4)} Kingtom's employees' history with Chinese aluminum
> extruders; {(5)} the varying evidence from site visits as to actual production
> capacities and Kingtom's minimal production during the site visits; and {(6)} the
> issues with the theoretical production volume. Accordingly, evidence on the
> record indicates that Kingtom transshipped co-mingled Chinese-origin aluminum
> extrusions to the United States.

C.R. 463 at 17.  None of this information demonstrates that any aluminum extrusions shipped by

Kingtom were Chinese origin.  Furthermore, CBP fails to provide a single record cite for any of

the selected information.

In *Changzhou Trina Solar Energy Co. v. United States*, the court reversed Commerce's

determination that programs discovered during a CVD investigation were countervailable when

Commerce failed to point to any "specific factual evidence or allegations in the record" that

supported the factors for countervailability . *Changzhou*, 195 F. Supp. at 1347.  The court

concluded that "{a}lthough Commerce reasonably invoked its authority . . . to use facts

otherwise available, with an inference adverse," Commerce was still required to "make the

necessary factual findings to satisfy the requirements for countervailability." *Id.* at 350.

NON-CONFIDENTIAL

Similarly, here the record here is totally devoid of any evidence of evasion, one factor of which would require evidence that the Importers entered Chinese-origin extrusions.

The evidence cited regarding Kingtom's "strong ties to China" is not affirmative evidence of commingling or transshipment. The fact that Kingtom employs Chinese workers and a *former* employee of Minfra, a separate unaffiliated Chinese aluminum extrusion producer, C.R. 463 at 5, 17, is not evidence of transshipment or evasion. Neither is Kingtom's establishment after the AD/CVD Orders, the nationality of its owners, or its relationships to Chinese suppliers. Kingtom detailed every material that was provided by each supplier. C.R. 262. It does not follow that, because Kingtom purchases auxiliary materials minimally used in production from Chinese suppliers, Kingtom must necessarily export Chinese-origin aluminum extrusions. Further, Kingtom's relationships with [          ] input suppliers are a red herring. The acts of casting and then extruding billets into the aluminum extrusions converts the country of origin to the Dominican Republic regardless of the origin of the inputs, and CBP expressly found that Kingtom actually produces aluminum extrusion in the Dominican Republic. C.R. 463 at 17. 19 U.S.C. § 4033(b)(2)(A); Annex 4.1, Chapter 76, Dominican Republic-Central America Free Trade Agreement; *see also* NY N310801 (Apr. 14, 2020). CBP failed to identify any evidence that a single extrusion was acquired through Kingtom's suppliers and did not explain how any theoretical extrusion could be Chinese-origin.

The facts that CBP selected regarding production also fail to support its determination. The "issues with the theoretical production volume" are nonexistent, as demonstrated above, and actually show that Kingtom produced all of the extrusions it sold. As explained, the Initial Determination selectively cites several months from Kingtom's data to allegedly show that Kingtom's sales volume exceeded its production volume, but the underlying exhibit actually

29

NON-CONFIDENTIAL

shows that Kingtom's production overall exceeded its sales.  The Initial Determination simply

excluded the months where Kingtom's production exceeded its sales.  C.R. 463 at 12; C.R. 397.

Additionally, the information from the site visits is not evidence of a lack of production

capacity.  All of the site visits confirmed that Kingtom had the [                         ] that it

claimed and actually showed that Kingtom used those presses in production.  C.R. 463 at 8-10.

The record evidence from the site visit, at most, would only constitute facts regarding Kingtom's

production at the particular moment that the CBP officials toured Kingtom's facility and is not

evidence of Kingtom's overall production.  C.R. 173.  ORR even noted on review that other site

visits by the Importers cannot speak to overall production unless they were "done for the express

purpose of making independent determinations that Kingtom was actually producing aluminum

extrusions in an amount equal to its total sales."  P.R. 318 at 12.  CBP's site visit does not

purport to have been made for this purpose and observed no records and drew no conclusions

regarding Kingtom's overall production.  C.R. 173.

Furthermore, the CBP site visit, which was conducted under the guise of a DR-CAFTA

verification, C.R. 173, actually verified that exports of Kingtom's aluminum extrusions are a

product of the Dominican Republic.  *See* C.R. 402 (providing the results of the DR-CAFTA

verification and noting "no change" regarding the relevant entry of Kingtom's aluminum

extrusions); C.R. 469 at 8.  CBP thus fails to explain how the site visits affirmatively

demonstrate that Kingtom did not produce all of the extrusions that it sold to the importers or

that its extrusions do not originate in the Dominican Republic, especially in light of the record

evidence demonstrating that Kingtom produced sufficient extrusions to cover its sales.  C.R. 397.

At best, the record evidence selected by CBP shows only that Kingtom's relationship

with Chinese entities "allows for the *possibility* of transshipment of or comingling of Chinese

NON-CONFIDENTIAL

aluminum extrusions." C.R. 463 at 8. Finding affirmative evidence from a mere possibility

renders CBP's decision arbitrary as it lacks the slightest record evidence to back it. *See*

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 818 F. Supp. 348, 373, 17 C.I.T.

146, 175 (1993) ("A mere possibility . . . is not substantial evidence on the record"); *Bloom v*

*Hartford Life and Accident Ins. Co.*, 338 Fed. Appx. 498 (6th Cir. 2009) (upholding a district

court decision that found the denial of benefits based "overwhelmingly" on circumstantial

evidence to be arbitrary and capricious because it ignored actual record evidence); *see also*

*Norman v. U.S. Dep't Labor*, 2015 WL 4771443 at *5 (E.D. Tenn. 2015) (finding the

Department of Labor's rejection of a medical report based on a mere possibility that it contained

errors without more was arbitrary and capricious). CBP does not cite to any evidence at all that

Kingtom purchased, imported, or possessed Chinese aluminum extrusions or that Kingtom

exported any Chinese-origin aluminum extrusions to the United States. *E.g.*, C.R. 463 at 17.

There is simply no such evidence on the record — bills of lading, certificates of origin, import

data, or otherwise. Moreover, CBP actually verified that exports of Kingtom's aluminum

extrusions are a product of the Dominican Republic when it [

]. *See* C.R. 402.

Even if there was some evidence of evasion, the facts selected cannot show that 100

percent of the entries by the importers contain Chinese-origin aluminum extrusions. CBP

determined as AFA that *every* entry that the importers made from Kingtom during the POI *and*

*all prospective* entries did and will contain commingled Chinese-origin aluminum extrusions.

C.R. 463 at 18 (changing entries covered by this investigation to type 3 subject merchandise and

determining that CBP will "continue" to suspend entries by the Importers). CBP's conclusion

that *all* entries covered by the investigation include subject merchandise lacks any rational

31

explanation or connection to the facts on the record, particularly given that CBP explicitly found that "Kingtom was able to produce aluminum extrusions in the Dominican Republic," and found that Kingtom produced a substantial portion of the extrusions it sold on a monthly basis for certain months during the period of investigation.  C.R. 463 at 12, 17; P.R. 318 at 12 ("There is no disagreement that Kingtom had the ability to produce aluminum extrusions.").  The site visits *did not find any evidence that any extrusion originated in China*, confirmed that Kingtom produced extrusions in the Dominican Republic, and actually verified that the relevant entry of Kingtom's merchandise as Dominican-origin warranted no change.  C.R. 173; C.R. 402.

The Initial Determination unreasonably assumes without any explanation or evidence that, despite all of the evidence of Kingtom's production in the Dominican Republic and CBP's express acknowledgment of such production, every entry under investigation included commingled Chinese aluminum extrusions.  Adverse inferences cannot be drawn for those facts that CBP found which demonstrate that Kingtom in fact produced at least some aluminum extrusions in the Dominican Republic.  *See, e.g.*, *Diamond Sawblades Mfrs. Coalition v. United States*, 966 F.3d 1351, 1366 (Fed. Cir. 2021) (remanding Commerce's adverse inferences as applied to all of respondent's sales where only a portion of the sales were found to be unreliable); *Hyundai Heavy Indus. v. United States*, 485 F. Supp. 3d 1380, 1399 (Ct. Int'l Trade 2020) (remanding application of total adverse facts available where "the reporting deficiencies identified by Commerce were "limited to 'discrete categories of information'").

Because CBP failed to select facts that support the determination that any, let alone all, aluminum extrusion imported by the Importers or exported by Kingtom originated in China, as required pursuant to the statute, CBP's Initial Determination is not in compliance with the

procedures defined in Section 517(c)(3) and should be reversed as arbitrary, capricious and otherwise not in accordance with law.

### B. ORR's Determination Was Arbitrary and Capricious and Not in Compliance With Section 517

Unlike TRLED's determination, which expressly relied on adverse inferences in lieu of actual evidence, ORR averred that the use of adverse inferences was unnecessary as "the record fully and adequately supports the finding that Kingtom commingled Chinese-origin aluminum extrusions with aluminum extrusions it produced in the Dominican Republic." P.R. 318 at 13. Such a conclusion should indicate that ORR identified affirmative evidence of evasion. However, ORR simply continued TRLED's practice of pointing to alleged "discrepancies" and Kingtom's "close ties" to China to justify an evasion finding.[8]

#### 1. ORR Failed to Point to Any Evidence Supporting a Finding of Evasion

ORR's Determination makes several claims that purportedly support a finding of evasion, but ORR's "factual findings" are uncorroborated and vague assertions that are unrelated to the alleged transshipment of Chinese extrusions. *Id.* at 12. The court has consistently found agency determinations unreasonable where the agency neglects to consider important record evidence and fails to rationally connect record evidence to the choice made. *Trust Chem. Co. v. United States*, 791 F. Supp. 3d 1257, 1268 (Ct. Int'l Trade 2011) ("Commerce's job is to compare the data on the record and provide an explanation that considers the important aspects of the problem."); *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1357 (Fed. Cir. 2020) ("Commerce has not provided a persuasive reason for using . . . data in light of unrebutted evidence of its unreliability."); *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir.

---

[8] Kingtom incorporates by reference the arguments set forth in Section IV.B of the Importers' motion for judgment on the agency record.

2011) ("Commerce . . . has an 'obligation' to address important factors raised by comments from

petitioners and respondents."); *Ad Hoc Shrimp Committee v. United States*, 882 F. Supp. 2d

1366, 1376 (Ct. Int'l Trade 2012) ("Because Commerce's stated reasoning regarding the

surrogate country selection in this review does not comport with a reasonable reading of the

record, this issue is remanded.").

 ORR's Determination is unreasonable because it failed to consider record evidence,

arguments raised by the importers, and did not sufficiently explain its conclusions.  In *Aimcor v.*

*United States*, the court found a determination by Commerce that costs had not been distorted by

hyperinflation to be "unreasonable" because of Commerce's "total failure to consider or discuss

data which, on its face, undermine{d} the position that Commerce took." *Aimcor v. United*

*States*, 23 C.I.T. 1000, 86 F. Supp. 2d 1248, 1261 (Ct. Int'l Trade 2000).  Specifically,

Commerce failed to articulate a sufficient explanation regarding evidence that the respondent

purchased inputs during a hyperinflationary period, and failed to discuss evidence that the

increase in costs "provided strong evidence that . . . costs were distorted." *Aimcor*,

86 F. Supp. 2d at 1264.  Similarly, ORR determined that Kingtom did not produce all of the

extrusions that it exported, P.R. 318 at 12, but failed to address the fact that Kingtom's

production exceeded its total sales.  C.R. 397.  Accordingly, ORR failed to address evidence

contrary to its conclusion like Commerce had done in *Aimcor*, rendering its Determination

similarly unreasonable.

 Each of the following demonstrate additional reasons why ORR's reading of the record is

unreasonable:

- ORR reviewed a "several minutes" long video that did not show a "significant
  number of employees working different machines" and shows some equipment not in
  use.  ORR did not specify which video it refers to, or explain why a video a few
  minutes in length evidences evasion.  The video could not reasonably demonstrate

34

NON-CONFIDENTIAL

that Kingtom could not produce all the extrusions it exports. Moreover, ORR did not address Importer Hialeah's argument that a few minutes, or even a full day, do not call into question years of production information provided to CBP. *See* C.R. 466 at 25.

- CBP observed minimal production during their one day site visit. As explained, CBP officials did not seek information or draw conclusions about Kingtom's overall production capacity at the site visit. C.R. 173. Additionally, as noted, the site visit actually corroborated production. *Id.* Importer Hialeah addressed this in its request for administrative review. *See* C.R. 466 at 20-26. However, ORR does not respond to the arguments raised in Hialeah's request for administrative review.

- Kingtom's daily production records show that Kingtom's machines did not operate at full capacity. However, Kingtom never claimed to be operating at 100% capacity. In fact, in its Supplemental RFI response it specifically explained that Kingtom's "[                                                    ].
  Kingtom [                                                                    ]" C.R. 377 at 28. ORR did not explain why Kingtom needed to be operating at full capacity every day in order to prove it was not be transshipping.

- Kingtom's equipment list shows machines being installed in different months than the equipment began producing extrusions. Beyond providing a citation to two exhibits in Kingtom's RFI response, ORR did not provide further explanation of this or why it was significant. Additionally, despite CBP's insinuations about the production records and equipment lists, the production records do not report a press being used before it was acquired and ready for use. C.R. 240; C.R. 243.

- The Importers' site visits were not done to determine Kingtom's total production. ORR did not explain why this discredited the sworn testimony of eye witnesses that all attested to seeing the [      ] extrusion presses that Kingtom reported it had.

- Kingtom's owners and some of its employees are Chinese citizens, and some of its material and equipment suppliers are from China. As explained, Kingtom's "strong ties to China" do not support for an evasion determination. *See* C.R. 466 at 27-29. ORR did not explain why this was substantial evidence of evasion.

ORR failed to make any rational connection between the record as stated in its Determination and its finding that any aluminum extrusions sold by Kingtom originated in China. ORR's Determination of commingling thus arbitrarily extends beyond the bounds of reasonable inferences that can be drawn from the facts found. In such circumstances, the Court should reverse ORR's determination as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

14487114—1

### 2.   ORR Misapplied the Substantial Evidence Standard

None of ORR's vague assertions are affirmative evidence, let alone substantial evidence, of commingling or transshipment.  Under a substantial evidence standard, there must be more than a "mere scintilla" of evidence to support a conclusion.  Evasion in the context of this EAPA case therefore requires *some* evidence that the aluminum profiles entered by the Importers were extruded in China.  Here, no such evidence exists.

While ORR concluded that substantial evidence supported TRLED's findings of Importers' evasion of the Orders, further examination reveals that, similar to TRLED's Initial Determination, ORR's Determination did not identify any affirmative evidence of evasion. Although ORR's decision quoted the factual and legal arguments that Importers made in their requests for review, its paper-thin "analysis" did not substantively address or weigh the merits of Importers' factual and legal arguments.  P.R. 318.  Rather than conduct such a substantive analysis of the Importers' arguments, ORR simply made vague assertions that even if true would not provide affirmative evidence of evasion.  *Id.* at 12.  Moreover, ORR ignored its obligation to examine the documents which proved the truth of the factual assertions by the Importers, instead favoring the claims made by TRLED, despite the requirement for a *de novo* review.  *Id.* (dismissing Importers' visits to Kingtom's facilities because they were not made for the specific purpose of verifying Kingtom's overall production capabilities).  Significantly, ORR did not evaluate and weigh Importers' comprehensive rebuttal of alleged discrepancies cited to by TRLED in its determination.  Nor did ORR acknowledge, let alone evaluate, Importers' record evidence supporting their arguments.  ORR's summary of TRLED's allegations of "discrepancies" ignored the Importers' rebuttal.

ORR failed to identify any facts that any extrusion originated in China, yet still insisted that *substantial evidence* of evasion exists without the application of AFA.  ORR cannot hold

36

that conclusions based entirely on assumptions are somehow grounded in substantial evidence on the record. ORR's Determination therefore failed to correctly apply the substantial evidence standard, lacked compliance with procedures under subsections (c) and (f) of Section 517, and should be reversed as arbitrary, capricious and otherwise not in accordance with law.

### C. CBP Violated Kingtom's Constitutional Right to Due Process

By not affording Kingtom an opportunity to respond to information presented against it, CBP violated Kingtom's constitutional right to due process. CBP failed to notify Kingtom of the existence of the investigation prior to the issuance of the Interim Measures, and CBP failed to allow Kingtom to seek an administrative review of the Initial Determination even though its primary focus of that determination was the application of AFA against Kingtom.

The Due Process Clause of the Fifth Amendment to the Constitution states that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is a fundamental tenant of due process to have a right to "notice and a meaningful opportunity to be heard" prior to such deprivation. *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012) (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)). While "foreign commerce is not a fundamental right protected by notions of *substantive* due process," *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998) (emphasis added), a market participant such as an importer "may be entitled to *procedural* due process … when the importer faces a 'deprivation of life, liberty, or property' by the Federal Government." *Id.* (emphasis added). The notice and opportunity to be heard in an administrative proceeding must be *prior* to the deprivation. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

**1. TRLED's Interim Measures Did Not Afford the Minimal Protections of Due Process**

Kingtom, was not afforded the minimal protections of due process — notice and an opportunity to be heard — before CBP took an action against it.  While the EAPA allegation was filed against the Importers and not Kingtom, Ta Chen alleged that Kingtom, not the importers, transshipped Chinese-origin aluminum extrusions.  *See* C.R. 1.  The entire focus of the investigation was the actions of Kingtom and its production of (or failure to produce) aluminum extrusions in the Dominican Republic.  And yet Kingtom was the last to know that it was under investigation.

On February 5, 2020, TRLED informed Importers that, during its secret investigations, TRLED had developed a record giving rise to a "reasonable suspicion" of evasion of the Orders by the Importers and consolidated the three initiated EAPA investigations into EAPA Inv. 7348. P.R. 193; C.R. 174.  Also, on February 5, 2020, TRLED notified the Importers that it had imposed interim measures on them, including requiring cash deposits from Importers of 93.38% ad valorem on unliquidated entries of aluminum extrusions exported to the U.S. from Kingtom. *See* C.R. 174.  In contrast, Kingtom was not notified by TRLED of the imposition of Interim Measures, despite the fact that TRLED's Interim Measures discussed Kingtom's operations in depth and referred to Kingtom as the core facilitator of the transshipment of Chinese aluminum extrusions through the Dominican Republic.  *See id.*  In fact, Kingtom had no notice of the investigation or the Interim Measures until informed by the Importers of their existence.  When the interim measures were imposed, Kingtom was forced to recall all shipments on the water and cancelled certain outstanding orders as the result of the 93.38% cash deposits that would be demanded on entry.  Kingtom was unable to receive compensation for the shipments that were on the water, while the high cash deposit requirement caused Kingtom to lose the Importers as

38

customers and to lose potential new customers, who did not want to take on the liability of the cash deposits.

The court has recognized that a party suffers irreparable harm when it is required to fundamentally alter its business operations in order to comply with a challenged Government action. *Corus Group PLC v. Bush*, 217 F. Supp. 2d 1347, 1354 (Ct. Int'l Trade 2002); *Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388, 393-94 (Ct. Int'l Trade 1994). Protected interests include goodwill, reputation, and freedom to take advantage of business opportunities. *See Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1327 (Ct. Int'l Trade 2014). Furthermore, the court has held that when a party demonstrates that compliance with a CBP ruling regarding country of origin would cause that party to incur costs, expenditures, business disruption, or other financial losses for which the party has no legal redress to recover in court, the party suffers irreparable harm even if ultimately successful on the merits. *CPC Int'l v. United States*, 896 F. Supp. 1240, 1243 (Ct. Int'l Trade 1995).

Here, Kingtom was forced to fundamentally alter its business operations in order to comply with CBP's Interim Measures. As this Court has already acknowledged, Kingtom has an interest in fulfilling its obligations under contract with its customers — protected interests that are not merely economic. *Global Aluminum Distrib. LLC v. United States*, 2021 Ct. Intl. Trade LEXIS 136 at *7-8 (Ct. Int'l Trade 2021) ("As the seller and exporter of the merchandise, Kingtom has a clear interest in disputing Customs' claim that it did not fulfill the terms of its contract. Although demonstrating that it did indeed perform in accordance with the terms of its contract would, no doubt, have some effect on Kingtom's future business, its interest in demonstrating that it fulfilled its obligations gives it an interest in the contract itself, that is not merely economic."). As a result of CBP's interim measures, Kingtom was not able to fulfill the

39

terms of its contracts with its U.S. importers, and continues to face potential lawsuits and a loss of goodwill with these customers, as well as hindering future business opportunities with these and potential customers as a result of the Interim Measures and Kingtom's broader reputational harm. While a determination that Kingtom did not engage in the alleged transshipment will aid in rehabilitating Kingtom's reputation, the damage to its business from the time of the Interim Measures to the present is irreparable and cannot be remedied or redressed under law. It is unreasonable to inflict such irreparable harm on Kingtom with no notice and opportunity to defend itself against or even plan for TRLED's impending action to minimize the harm it might possibly suffer because of TRLED's initiation of the EAPA investigation.

In *Shelter Forest*, an appeal of a Commerce anti-circumvention case, the court recognized that the government cannot take action without notice to the parties. In that case Commerce made a preliminary determination of circumvention and instructed CBP to suspend liquidation of relevant entries from "the date of initiation" of the investigation as provided in 19 CFR §351.225(l)(2). In determining the effective date of initiation, the court stated:

> Under 19 C.F.R. §351.225(l)(2), "the date of initiation" cannot be the internal signature date of September 18, 2018 because the parties were not provided with adequate notice until the Initiation Notice was published in the Federal Register on September 21, 2018. . . . As Commerce cannot suspend liquidation prior to providing parties with notice and the Government provides nothing to show the parties received adequate notice prior to publication, the date of initiation in this case must refer to the date of publication in the Federal Register.

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1404 (Ct. Int'l Trade 2021) (citing *Tai-Ao Aluminium*, 391 F. Supp. 3d 1301, 1313-14 (Ct. Int'l Trade 2019)). The *Shelter Forest* court refused to allow Commerce to suspend entries three days prior to the date the parties were notified.

The court further explained this principle in *Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370, 1379 (Ct. Int'l Trade 2019). In *Sumecht*, Commerce issued a *Timken* notice that

increased the applicable AD rate for the plaintiff from 13.18 percent to 238.95 percent, retroactive to 39 days before the notice was published in the Federal Register. *Sumecht NA, Inc.*, 399 F. Supp. 3d at 1378. That court concluded that because "retroactive application of the changed duty rate would affect Plaintiff's ability to make appropriate business decisions and take actions with the benefit of information required by a statutorily-mandated notice . . . {Commerce's} actions prejudiced the Plaintiff and amounted to more than harmless error." *Id.* at 1379.

In the instant case, while TRLED's suspension of liquidation of entries of Kingtom-produced imports and demand for cash deposits was not effective until CBP notified the Importers of the initiation of the investigation on February 5, 2020, the Interim Measures applied retroactively to Kingtom-produced imports entered from October 31, 2018 onward, *i.e.*, up to *a year and a half* before Kingtom was notified. This is a clear violation of the due process notice requirement, as demonstrated in *Shelter Forest* and *Sumecht*.

Under the normal AD/CVD proceedings that EAPA was enacted to enforce, Commerce directly notifies the implicated foreign producers and exporters such that they can protect their interests by reducing or cancelling shipments that might become subject to AD/CVD deposits. In this case, however, CBP did not provide Kingtom, the foreign producer and exporter, notice and did not provide Kingtom opportunity to respond to the allegation before being forced to alter its production operations, business model, and to have its products immediately subject to a 93% cash deposit rate. Instead, CBP entirely failed to consider Kingtom's interest in due process and timely notice of CBP's impending enforcement actions. The resulting Interim Measures cost Kingtom its reputation, goodwill, and the ability to pursue business opportunities, causing irreparable harm to Kingtom. *See Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1327 (Ct.

41

Int'l Trade 2014).  It is unreasonable for CBP to inflict such irreparable harm on Kingtom without any form of notice and without providing an opportunity to defend against these allegations against it prior to the imposition of measures.

In sum, CBP violated Kingtom's right to procedural due process by not allowing Kingtom to respond before action against it.  TRLED failed to provide Kingtom with any notice of the initiation of an EAPA investigation or the imposition of interim measures against its produced and exported aluminum extrusions.  Moreover, TRLED failed to provide Kingtom an opportunity to defend itself before inflicting irreparable harm to its business interests.  The procedural failures in this case involve actions that contravene well-established parameters for governmental action.  This is not simply a mistake in process that requires a remand.  The actions of the government reveal failure after failure of essential process that led to profound harm for which there is no remedy under the law.

### 2.  CBP Failed to Provide Kingtom With the Opportunity to Respond to The Initial Determination

After TRLED made its Final Determination of evasion, Kingtom and the Importers timely submitted requests for review of TRLED's determination.  ORR acknowledged receipt of these requests for review on December 17, 2020, but rejected Kingtom's request for review, as Kingtom was not a "party to the investigation" within the meaning of CBP's EAPA regulations. *See* P.R. 301; P.R. 318 at 2 n.2 ("Pursuant to 19 U.S.C. § 1517(f)(1) and 19 C.F.R. § 165.41(a), only parties to the investigation may file a request for administrative review.  As Kingtom, by definition, is not a party to the investigation, its request for administrative review was rejected by ORR on December 17, 2021, the date upon which ORR commenced its administrative review."); *see also* 19 C.F.R. § 165.1 ("The phrase 'parties to the investigation' means the interested party (or interested parties, in the case of consolidation pursuant to § 165.13) who filed the allegation

14487114–1

of evasion and the importer (or importers, in the case of consolidation pursuant to § 165.13) who allegedly engaged in evasion."). As a result of ORR's rejection of Kingtom's request for review and failure to consider Kingtom's arguments, Kingtom was unable to directly defend its interests against a determination that, due to its alleged failure to cooperate, found as an adverse inference that it transshipped Chinese extrusions.

The term "party/parties to an investigation" is unilaterally created and defined by CBP in 19 C.F.R. § 165.1 to include only the EAPA alleger and the U.S. importer(s) who allegedly engaged in evasion at entry. *See* 19 CFR § 165.1. Significantly, this term is not found in the EAPA statute. While the statute does state that "a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation may file an appeal" to ORR, 19 U.S.C. § 1517(f)(1), the statute does not affirmatively preclude other interested parties, such as the foreign producer and exporter, from filing such an appeal. *See id.* ORR's statement that the statute precludes the foreign producer and exporter from filing an administrative appeal is an inaccurate representation of the statute. Similarly, the EAPA regulation concerning the filing of administrative review requests simply states that requests for review "may be filed by any party to the investigation . . . ." 19 C.F.R. § 165.41(a). It does not, however, explicitly preclude other interested parties, such as the foreign manufacturer, from filing a request for administrative review.

Notably, CBP did not address any due process concerns in its comments when promulgating its draft regulations. *See* CBP, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations; Solicitation of Comments*, 81 Fed. Reg. 56,477. In its comments, CBP claimed that it "endeavored to make the proceedings under the EAPA as transparent as possible and to provide for full participation and engagement by all parties

43

involved in an EAPA investigation." *Id.* at 56,479.  Ironically, however, CBP specified that such

full participation and engagement does not extend to parties other than the parties to the

investigation:

> During CBP's investigation, it is possible that there will be other parties from whom CBP
> will solicit information and that CBP will put that information on the record. Those
> parties (who are not parties to the investigation as defined in § 165.1), however, do not
> have a right to participate in the proceedings

*Id.*  Nonetheless, in the very next paragraph, CBP contemplated applying AFA against foreign

exporters or producers, who are not "parties to the investigation," despite the fact that CBP

explicitly stated that it does not believe such parties have the right to participate in the

proceedings.  *Id.* at 56,479-80.  It is clear that CBP did not contemplate the obvious due process

issues with this position or simply ignored such concerns.

Because the EAPA regulations only provide that the alleger and the alleged evading

importers qualify as "parties to the investigation" and are permitted to fully participate, Kingtom

was not able to respond to the Initial Determination during the course of the administrative

review, despite the fact that this was the only opportunity at the administrative level for Kingtom

to have a meaningful opportunity to be heard and to challenge the finding that it failed to

cooperate to the best of its ability.  TRLED has continued to rely upon the finding in this case in

subsequent cases without conducting further factual inquiries, harming Kingtom's reputation,

business prospects, and future and current sales.  Failing to allow Kingtom to meaningfully

participate in the administrative review was a violation of its Fifth Amendment right to respond

to evidence and findings against it.

**VIII.    <u>CONCLUSION</u>**

For the foregoing reasons we respectfully request that this Court reverse CBP's

determinations and direct them to find that Kingtom did not transship Chinese extrusions to the

Importers and that the Importers therefore did not evade the AD/CVD Orders on aluminum

extrusions from China.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Kingtom Aluminio S.R.L.*

45

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing submission complies with the

Standard Chambers Procedures of the U.S. Court of International Trade in that it contains

13, 935 words including text, footnotes, and headings and excluding the table of contents, table

of authorities and counsel's signature block, according to the word count function of Microsoft

Word 2016 used to prepare this response to Defendant's Motion to Dismiss.

**/s/ Brady W. Mills**