# UNITED STATES COURT OF INTERNATIONAL TRADE

Before the Hon. Richard K. Eaton, Senior Judge

| | |
|---|---|
| Global Aluminum Distributor LLC,<br><br>          Plaintiff,<br><br>  and<br><br>Hialeah Aluminum Supply, Inc.,<br><br>          Consolidated Plaintiff,<br><br>  and<br><br>Kingtom Aluminio S.R.L.,<br><br>          Plaintiff-Intervenor,<br><br>    v.<br><br>United States,<br><br>          Defendant,<br><br>  and<br><br>Ta Chen International, Inc.,<br><br>          Defendant-Intervenor. | **Final Business Confidential Information Has Been Deleted from Brackets on Pages 14-22, 31-33, and 35**<br><br><br>Consolidated Court No. 21-00198 |

## MEMORANDUM OF LAW IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFF GLOBAL ALUMINUM DISTRIBUTOR LLC AND CONSOLIDATED PLAINTIFF HIALEAH ALUMINUM SUPPLY, INC FOR JUDGMENT UPON THE AGENCY RECORD

Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell
FOX ROTHSCHILD LLP

2020 K Street NW, Suite 500
Washington, DC 20006
llevinson@foxrothschild.com
Counsel for Consolidated Plaintiff

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
    Counsel for Plaintiff

Dated: February 14, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS     i

TABLE OF AUTHORITIES     ii

I.    INTRODUCTION     1

II.    STATEMENT PURSUANT TO RULE 56.2(c)     1

   A. Administrative Determination Under Review ........................................................... 1

   B. Statement Of Issues Presented ................................................................................... 1

   C. Summary Of Arguments ............................................................................................ 2

   D. Statement of Facts ..................................................................................................... 4

III.    STANDARD OF REVIEW ........................................................................................ 8

IV.    ARGUMENT ............................................................................................................ 10

   A. THE APPLICATION OF ADVERSE INFERENCES WAS ARBITRARY AND CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW………….. ........................................................................................................ 10

     1. CBP May Not Apply Adverse Inferences To Plaintiffs Based On Kingtom's Alleged Failure To Cooperate ........................................................................... 10

     2. CBP Unlawfully Applied Adverse Inferences Based on Alleged Discrepancies ................................................................................................... 11

       i. Differences Between Kingtom's Financial Accounts and Plaintiffs' Financial Accounts .................................................................................. 14

       ii. Discrepancies Between Reports of Site Visits to Kingtom .................... 22

   B. SUBSTANTIAL EVIDENCE ON THE RECORD DOES NOT SUPPORT A FINDING OF EVASION………….. ......................................................................... 25

     1. Plaintiffs Did Not Make a Material and False Statement, Act or Omission ........ 25

     2. Vague and Conclusory Assertions Do Not Constitute Substantial Evidence of Evasion ....................................................................................................... 28

       i. Photographs and Videos of Kingtom's Facilities ................................... 29

  *ii.*  Site Visit By U.S. Government Officials ................................................... 31

  *iii.*  Daily Production and Equipment Records ............................................... 32

  *iv.*  Importers' Site Visits ............................................................................. 34

C. CBP'S INVESTIGATION PROCEDURES VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS…………................................................................................. 38

 1. CBP Failed to Provide Adequate Public Summaries of Information ................. 39

 2. CBP Denied Plaintiffs the Opportunity to Comment on CBP's Findings Involving Their Own Confidential Information .................................................. 41

 3. Plaintiffs Had a Due Process Right to Notice and an Opportunity to Be Heard Before Imposition of the Duties ............................................................. 42

D. CBP SHOULD HAVE CONSOLIDATED EAPA INV. NOS. 7348 AND 7423….43

V. CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aluminum Extrusions Fair Trade Comm. v. United States*,
   36 C.I.T. 1370, 2012 WL 5201218 (2012) ...........................................................10

*Atlantic Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984).............................................................................9

*Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc*,
   419 U.S. 281 (1974).............................................................................................39

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)......................................................................................10, 26

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984).............................................................................................8

*CS Wind Vietnam Co., v. United States*,
   832 F.3d 1357 (Fed. Cir 2016).......................................................................30, 33

*Diamond Tools Tech. v. United States*,
   Slip. Op. 21-151, Ct. No. 20-00060 (Ct. Int'l Trade 2021) .............................39, 42

*Diamond Tools Technology LLC v. United States*,
   2021 WL 5149856 (Ct. Int'l Trade 2021).................................................26, 27, 30

*Diversified Products Corp. v. United States*,
   6 CIT 155 (1983) ...................................................................................................9

*Fujian MacH and Equip. Import & Export v. U.S..*,
   276 F.Supp. 2d 1371 (Ct. Int'l Trade 2003) ......................................................22

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997)...............................................................................9

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716, 720 (Fed. Cir. 1997).......................................................................31

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
   28 C.I.T. 1185 (2004) .........................................................................................11

*HiSteel Co. Ltd. v. United States*
   Ct. No. 20-00146, 2021 WL 4317690 (Ct. Int'l Trade Sept. 23, 2021) .........36, 37

*Hyundai Steel Co. v. United States*,
  415 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .......................................................37

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301, 1327 (Fed. Cir. 2009).................................................................10

*Lucent Trading Co. v. United States*,
  683 F. Supp. 2d 1348, 1354-1355 (2010) ...........................................................39

*Nereida Trading Co. v. United States*,
  683 F. Supp. 2d 1348, 1354-1355 (2010) .......................................................39, 42

*Nexteel Co., Ltd. v. United States*
  594 F. Supp. 3d 1320, 1331-32 (Ct. Int'l Trade 2008) .........................................26

*Nexteel Co., Ltd. v. United States*
  450 F. Supp. 3d 1333, 1338 (Ct. Int'l Trade 2020) ..............................................36

*Norca Industrial Co., LLC et al v. United States*,
  (Consol. Ct. No. 21-00192, Ct. Int'l Trade) .........................................................41

*Nucor Corp. v. United States*,
  594 F. Supp. 3d 1320 (Ct. Int'l Trade 2008) .......................................................26

*PSC v. United States*,
  483 F. Supp. 3d 1294, 1307-08 (Ct. Int'l Trade 2020) .........................................41

*PSC VSMPO-Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012).............................................................................42

*Royal Brush Manufacturing v. United States*,
  483 F. Supp. 3d 1294 (2020) ................................................................38, 39, 41

*SKF USA Inc. v. United States*
  675 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ..................................................10, 11

*Star Fruits S.N.C. v. United States*,
  393 F.3d 1277 (Fed. Cir. 2005)..............................................................................8

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994)..................................................................................9

*Suramerica Stainless Steel Pipe v. United States*,
  23 C.I.T. 804 (1999) .............................................................................................11

*Ta Chen Stainless Steel Pipe v. United States*,
  23 C.I.T. 804 (1999) .............................................................................................11

iv

*Transcom v. United States*,
121 F. Supp. 2d 690 (2000) ...............................................................40, 43

*Tung Mung Dev. Co., v. United States*,
354 F.3d 1371 (Fed. Cir. 2004)..........................................................10

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ..........................................................................9

*USX Corp. v. United States*,
11 CIT 82, 655 F. Supp. 487 (1987) ....................................................9

*Wheatland Tube Co. v. U.S.*,
495 F.3d 1355 (Fed. Cir. 2007) ...........................................................8

**Statutes**

19 U.S.C. § 1517 ........................................................................................1, 8

19 U.S.C. § 1517(a)(5)(A) ........................................................................26

19 U.S.C. § 1517(a)(6) ..............................................................................1

19 U.S.C. §1517(c)(1)(A) ..........................................................................8

19 U.S.C. § 1517(c)(3)(A) ........................................................................11

19 U.S.C. § 1517(g) ..................................................................................8

19 U.S.C. § 4033(b)(2)(A) ........................................................................35

28 U.S.C. § 2631(k)(1) ..............................................................................1

**Regulations**

19 C.F.R. § 165.1 ......................................................................................26

19 C.F.R. § 165.13(b) ...............................................................................43

19 C.F.R. § 165.4 .................................................................................39, 41

19 C.F.R. § 165.49(a)(2) ...........................................................................39

19 C.F.R. § 165.6(a) .................................................................................12

**Administrative Decisions**

Aluminum Extrusions from the People's Republic of China,
87 Fed. Supp. 7088 (Feb. 8, 2022)............................................................................43

Aluminum Extrusions from the People's Republic of China,
87 Fed. Reg. 7423 (Feb. 9, 2022) ............................................................................43

**U.S. Constitution**

U.S. Constitution Fifth Amendment ................................................................38, 42, 43

**Other Authorities**

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Section 504
Stat. 362 (2015).......................................................................................................36

## I.  INTRODUCTION

This action is brought pursuant to 19 U.S.C. § 1517 to contest the November 2, 2020 Initial Determination ("Initial Determination") issued by CBP's Office of Trade, Trade Law Enforcement Directorate ("TRLED"), Confidential Record ("CR") 463, and the March 18, 2021 Final Determination ("Final Determination") issued by CBP's Office of Trade, Office of Regulation and Rulings ("OR&R").  Public Record ("PR") 318.

Plaintiff Global Aluminum Distributor LLC ("Global Aluminum" or "GA") and Consolidated Plaintiff Hialeah Aluminum Supply, Inc. ("Hialeah") ("Plaintiffs" or "Importers"), both Florida corporations, imported and sold certain aluminum extrusions produced in the Dominican Republic subject to CBP's evasion investigation and are interested parties pursuant to 19 U.S.C. § 1517(a)(6) and 28 U.S.C. § 2631(k)(1).  Both companies participated fully in the administrative proceedings before CBP.

## II.  STATEMENT PURSUANT TO RULE 56.2(c)

### A.  Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1517 to contest TRLED's November 2, 2020 Initial Determination (CR 463), and OR&R's March 18, 2021 Final Determination (PR 318).  In these determinations, CBP found that Plaintiffs' supplier, Kingtom, had evaded the antidumping and countervailing duty orders on Aluminum Extrusions from China (the "Orders").

### B.  Statement of Issues Presented

This matter presents the following issues.  In each instance, CBP's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law. The issues are:

1. Whether CBP's application of adverse inferences was unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2. Whether CBP's determination that Plaintiff's evaded the Orders was unsupported by substantial evidence and therefore was arbitrary, capricious, or otherwise not in accordance with laws

3. Whether CBP's failure to disclose to Plaintiffs the information on which it based its evasion determination, and thereby deprive Plaintiffs of the opportunity to raise defenses against its allegations was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

4. Whether CBP's failure to properly consolidate this matter with EAPA case 7423 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

## C.  **Summary Of Argument**

CBP's determinations that Plaintiffs evaded the Orders is unsupported by substantial evidence and is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law.  This Court should reverse TRLED's Initial Determination and OR&R's Final Determination.  Neither determination makes any factual findings of evasion.  There is no affirmative evidence that Plaintiffs entered Chinese-origin aluminum extrusions from Kingtom. Rather than support its findings with substantial evidence on the record, TRLED determined that alleged "discrepancies" between documents submitted by Kingtom and the Importers, as well as Kingtom's "ties to China," justified the application of adverse inferences.  There was no basis for CBP's application of adverse inferences as each of the Importers subject to the investigation and Kingtom fully complied with CBP's requests for information to the best of their ability.

In the Final Determination, OR&R found that substantial evidence on the record supports a finding that Kingtom commingled and transshipped Chinese-origin aluminum extrusions with aluminum extrusions it produced in the Dominican Republic. *See* CR 463 at 13. OR&R determined that although the record established that Kingtom had the ability to produce aluminum extrusions, the record does not support a finding that Kingtom produced *all* of the aluminum extrusions it exported to the United States. *See* CR 463 at 12. Like TRLED, OR&R's determination was not supported by substantial evidence on the record and instead relied on vague assertions about Kingtom's production, its capacity, and its "close ties" to China. CBP has misapplied the substantial evidence standard, which requires some evidence of evasion and not mere supposition. Accordingly, OR&R's Final Determination should be reversed as arbitrary, capricious, and otherwise not in accordance with law.

In addition, CBP violated Plaintiffs' constitutional right to due process by unlawfully imposing interim measures without giving proper notice and an opportunity to be heard beforehand. CBP imposed interim measures on Plaintiffs before even notifying them an investigation into their imports from Kingtom existed. The interim measures imposed an obligation on Plaintiffs to post cash deposits of antidumping and countervailing duties equal to 93.38 percent of the value of goods on all aluminum extrusions imported from Kingtom. These measures effectively prevented Plaintiffs from purchasing from Kingtom and disrupted their business activities.

Finally, CBP abused its discretion in refusing to consolidate this matter with EAPA Inv. No. 7423.

### D. Statement Of Facts

On July 11, 2019, Ta Chen International Inc. ("Ta Chen" or the "Alleger") filed a

simultaneous allegation that multiple importers – Global Aluminum, Florida Aluminum, and Hialeah (collectively, the "Importers") – were importing certain aluminum extrusions that were being transshipped by Kingtom through the Dominican Republic ("DR") in order to avoid paying antidumping and countervailing duties imposed by the Orders on aluminum extrusions from China. CBP has not included the initial allegation in the record.

The Alleger's parent company is a Taiwanese company with numerous employees in the United States who are non-U.S. citizens, including the Chief Engineering Officer and the Controller. *See* CR 284 at pp. 13-14 and 16-17, and 321 at Exhibit C-1 ; PR 226-228 at pp. 13-14, and 16-17 and Exhibit C-1.

By phone, CBP requested that the Alleger revise the initial allegation to address certain deficiencies. CR 9-11 at p. 1, fn 1. The initial allegation and the specific contents of CBP's phone call to Alleger's counsel regarding the allegation's deficiencies have not been provided in any form to Plaintiffs or Kingtom.

On July 31, 2019, prior to initiating an investigation, or even acknowledging receipt of an allegation, CBP conducted a site visit of Kingtom's facility under the pretext of a DR-CAFTA verification. *See* CR Doc. 172 ("Attache Report"). CBP selectively cited portions of the visit summary, which were not disclosed to Plaintiffs or Kingtom. CBP also did not place a public summary of the site visit on the record.

On August 22, 2019, the Alleger filed the Supplemental Allegation alleging that the Importers evaded the Orders by importing Chinese-origin aluminum extrusions from Kingtom that were declared of Dominican-origin. *See* PR 1-3; CR 1-3. CBP acknowledged receipt of the Supplemental Allegation on October 19, 2019. *See* PR 7.

CBP initiated Consolidated Case No. 7348 with regard to Global Aluminum, Florida

Aluminum and Hialeah on October 31, 2019 ("Notice of Initiation"). *See* CR 9-11; PR 14-16. In the Notice of Initiation, CBP informed the Importers that TRLED has made a determination of reasonable suspicion of evasion and imposed "interim measures" that required the Importers to post cash deposits for AD/CV duties equal to 93.38 percent of the value of entered aluminum extrusions from Kingtom. *Id.*

On November 19, 2019, and November 20, 2019, without disclosing the existence of the EAPA matter, CBP issued CF-28 requests for information ("RFIs") to Global Aluminum, Hialeah and Florida Aluminum. *See* CR 12-14. GA and Florida Aluminum responded to the CF-28 RFIs on January 6, 2020. *See* CR 15-170; PR 17-188.

On February 19, 2020, CBP sent an RFI to Kingtom and to the Importers. *See* PR 194-198. Kingtom submitted its RFI response on March 13, 2020. *See* CR 175. Therein, Kingtom explained the production capacity of its equipment, *see id.* at Exhibit 19 (CR 240), provided daily extrusion production records for its extrusion machines, *see id.* at Exhibit 21 (CR 243), and listed all of its suppliers of aluminum raw materials and the materials they supplied. *See id*. at 5-7 (CR 175), Exhibit 9 (CR 175). Kingtom also documented its production process from the time the order was acknowledged until shipment. *See*. CR 175-272; P,R, 199-212).

Hialeah timely submitted its RFI response on March 20, 2020 ("Hialeah Initial RFI Response"). *See* CR 273-278; PR 214-217). Hialeah responded to all of CBP's information requests, and provided the details of its imports from Kingtom during the POI. *See id.* This submission contained a signed statement from a Hialeah representative summarizing the details of a visit to Kingtom and observations of its production. *See* CR 421 at Appendix F.

On May 22, 2020, GA submitted additional, voluntary factual information to establish that there is no evidence to support the allegation of transshipment ("GA Voluntary Factual

Submission"). *See* CR 280-323; PR 223-250. This submission included an affidavit from a third-party describing his visit to Kingtom and providing his evaluation of Kingtom's production capability. *See* Exhibit A to GA's submission of voluntary information. (CR 223).

Hialeah also submitted voluntary factual information on May 22, 2020 to establish that there is no evidence to support the allegation of transshipment. *See* CR 324-374; PR 251.

On June 3, 2020, CBP issued a supplemental RFI to Kingtom. *See* CR 377; PR 252. Kingtom timely responded to the RFI on June 17, 2020. *See* CR 416 ("Kingtom Supplemental RFI Response"). In Kingtom's Supplemental RFI Response, Kingtom reported its theoretical production volumes based on the daily production records reported in its RFI response. *See id.* at Exhibit S-18 (CR 397), Exhibit S-21 (CR 403). Kingtom also reported its monthly export and local sales information, and further described its production process. *See id.*

On June 19, 2020, CBP issued supplemental RFIs to GA, Florida Aluminum, and Hialeah. CR 417-419; PR 260-262.

On June 24, 2020, Florida Aluminum replied to the supplemental RFI. *See* CR 420; PR 263. Hialeah submitted its Supplemental RFI Response on June 24, 2020. *See* CR 421 and PR 277. On June 24, 2020, GA responded to the supplemental RFI ("GA Supplemental RFI Response"). *See* CR 422-462; PR 264-276.

On July 16, 2020, GA requested that CBP consolidate EAPA Inv. No. 7348 with EAPA Inv. No. 7423 because GA was named as a respondent in both of these investigations. *See* PR 279. The request for consolidation detailed how these cases substantially overlapped and how the two concurrent investigations placed GA in the situation where it was being forced to respond to the same allegations in two matters on essentially identical facts and claims.

CBP rejected the request for consolidation but engaged in a *de facto* consolidation for its

own benefit, by placing the record of 7348 on the record of 7423.

The Importers submitted legal arguments to CBP on September 30, 2020. *See* PR 281. On September 30, 2020, Kingtom also submitted written comments to CBP on September 30, 2020; however, CBP refused to consider Kingtom's submission of written comments. *See* PR 281.

On November 2, 2020, CBP issued its initial determination of evasion ("TRLED Initial Determination"), finding that while the evidence established that Kingtom was able to produce aluminum extrusions in the Dominican Republic, Kingtom's failure to submit accurate information and cooperate to the best of its ability meant that CBP was unable to determine that Kingtom actually produced all of the aluminum extrusions it sold. *See* CR 463 at 17; PR 286 at 17. CBP therefore inferred that all merchandise imported into the United States by the Plaintiffs contained co-mingled Chinese- and Dominican Republic-origin aluminum extrusions. *See id.*

On November 17, 2020, Plaintiffs and Kingtom requested that CBP provide a version of the Initial Determination that did not redact each party's respective information in order to respond to the Initial Determination. *See* PR 287-292. CBP denied each party's request for a version of the Initial Determination that disclosed their own information.

On December 16, 2020, the Importers submitted requests for a *de novo* administrative review of TRLED's Initial Determination. *See* CR 464-468; PR 293, 296-297. Kingtom also submitted an administrative review request of TRLED's Initial Determination, which CBP rejected on December 17, 2020 on the grounds that Kingtom was not an interested party. *See* PR 301.

On March 18, 2021, CBP issued its determination in the *de novo* administrative review finding that "when looking at the totality of the circumstances regarding evidence of Kingtom's actual production levels coupled with Kingtom's affiliations with China, a finding of evasion due to the commingling of Chinese-origin aluminum extrusions with Dominican Republic-origin

aluminum extrusions is supported by substantial evidence in the record. PR 318 at 13. In making this Final Determination, CBP expressly stated that it would not address the remaining arguments made by the importers.

## III.  STANDARD OF REVIEW

The Court will hold unlawful CBP determinations in EAPA matters if CBP failed to comply with all relevant procedures or if the determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1517(g). To determine whether CBP's interpretation and application of 19 U.S.C. § 1517 is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).

CBP abuses its discretion when it bases its decision "on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence or represent an unreasonable judgment in weighing relevant factors". *Star Fruits S.N.C. v. United States,* 393 F.3d 1277, 1281 (Fed. Cir. 2005).

If the statute is silent or ambiguous with respect to the specific issue, the Federal Circuit has held that *Chevron* deference is owed the agency's statutory interpretation. To determine reasonableness, courts look to the express terms of the statute, the objectives of the statute, and the objectives of the statutory scheme as a whole. *See Wheatland Tube Co. v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

The EAPA statute directs CBP to make a determination of evasion "based on substantial evidence." 19 U.S.C. §1517(c)(1)(A). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence"

must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is appropriate to set aside the [the agency's] decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, CBP's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

CBP must make its decisions based on a fair and balanced comparison of the data. To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Although the agency's findings may be found to "be supported by substantial evidence even where two inconsistent conclusions could be drawn from the record, agencies act contrary to law if their decision-making is not reasoned. *See Aluminum*

*Extrusions Fair Trade Comm. v. United States*, 36 C.I.T. 1370, 1373, 2012 WL 5201218 (2012);

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962).

Moreover, when substantial evidence is not utilized, such action is tantamount to the use

of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301,

1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial

evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal

quotation marks omitted)).

It is axiomatic that CBP may not exert its authority in an arbitrary or capricious manner.

*See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004).  CBP's

decision will be set aside if it is arbitrary and capricious.  In sum, CBP's evasion determination,

as affirmed by the administrative record falls short of the Court's standard of review.


## IV.  ARGUMENT

### A. THE APPLICATION OF ADVERSE INFERENCES WAS ARBITRARY AND CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW

#### 1. CBP May Not Apply Adverse Inferences To Plaintiffs Based On Kingtom's Alleged Failure To Cooperate.

TRLED's Initial Determination found that "Kingtom did not act to the best of its abilities"

given the "lack of information regarding its production," CR 463 at 17, and as a result, applied

adverse inferences. In *SKF USA Inc. v. United States*, a respondent fully cooperated in a review

but an unaffiliated supplier failed to provide cost information, and as a result, Commerce applied

a dumping margin to the respondent using adverse inferences.  675 F. Supp. 2d 1264 (Ct. Int'l

Trade 2009).  The court found that Commerce's construction of the adverse inferences statute,

which would allow it to apply adverse inferences to a party that fully cooperated, was

impermissible and an abuse of discretion. *SKF*, 675 F. Supp. 2d at 1275.  The court noted that the

supplier "was not a party to the administrative review proceeding" and was not in a position to be assigned the adversely selected margin. *SKF*, 675 F. Supp. 2d at 1275. The court also reasoned that allowing one party's failure to cooperate to adversely affect the dumping margin of another party "violates" the "obligation to treat fairly every participant in an administrative proceeding" and "a construction permitting such an absurd result makes a mockery of any notion of fairness." *SKF*, 675 F. Supp. 2d at 1276.

Like in *SKF*, CBP may not apply an adverse inference to the importers based on Kingtom's alleged failure to cooperate. The statute limits the application of adverse inferences only to the party who failed to cooperate. It provides that if CBP "finds that a party" has failed to cooperate, CBP may "use an inference that is adverse to the interests of *that party*." 19 U.S.C. § 1517(c)(3)(A) (emphasis added). CBP's application of adverse inferences to the importers, whom CBP did not find failed to cooperate, is an impermissible construction of the statute, contrary to the procedures defined in Section 517(c), and otherwise not in accordance with law.

### 2. CBP Unlawfully Applied Adverse Inferences Based on Alleged Discrepancies

In the EAPA investigation, CBP denied Plaintiffs a meaningful opportunity to address alleged perceived deficiencies in their RFIs before TRLED issued its determination. *See, e.g. Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804 (1999); *see also Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1193-95 (2004) (noting that alleged deficiencies in submitted information that are only articulated upon the issuance of the Final Determination provide little basis from which to understand how to remedy the identified deficiencies before the conclusion of a proceeding, as well as little reason to seek out additional information to supplement the submitted data). While these cases are Court reviews of Commerce's antidumping proceedings, the legal standards for applying adverse inferences (*i.e.*, not acting to best of ability) and due process are the same as in the EAPA proceedings. Simply

put, it is impossible to address a perceived deficiency if one is not notified of it. This Court's jurisprudence as to EAPA is just beginning, but its long-established, existing jurisprudence on the standards for application of adverse inferences are pertinent.

CBP based its determination on adverse inferences and expressly refused to consider certain arguments raised by Plaintiffs. CBP's determination to apply adverse inferences was unsupported by the record. Plaintiffs submit that the alleged deficiencies in their RFIs were never identified so as to permit them to be addressed, and therefore deprived Plaintiffs of due process. Plaintiffs were, in fact, placed at an unfair disadvantage as they had no meaningful way to know the nature of the alleged discrepancies and address such discrepancies. Plaintiffs had a substantial number of transactions. Without identification of which transactions had discrepancies and the nature of the discrepancies, Plaintiffs could not adequately address the discrepancies and were left only to speculate the issues that CBP identified.

An aggravating factor is that at least some of the alleged discrepancies were the direct result of CBP's misreading of documents of record, followed by its unwillingness to request clarification. CBP's determination, and the voluminous record, demonstrate that all parties fully cooperated and responded in a timely fashion to CBP's initial and supplemental requests for information. Plaintiffs' cooperation with CBP throughout the investigation confirms that these parties would have clarified points on which CBP had outstanding questions. Rather than seeking clarification, CBP simply drew unsupported adverse inferences without providing the parties a meaningful chance to address such discrepancies.

The EAPA regulations only permit CBP to apply adverse inferences during an investigation under limited circumstances – i.e. if a party to the investigation "fails to cooperate and comply to the best of its ability with a request for information made by CBP." 19 C.F.R. §

165.6(a)). No such finding can be made against Plaintiffs. Nor, in fact, has CBP found that adverse inferences were warranted based on Plaintiffs' lack of cooperaton.

Critcally, a primary basis for the application of adverse inference was a purported failure to explain discrepancies which CBP did not fully disclose to the parties and did not request the parties to address. In this brief, Plaintiffs focus on the purported differences between submissions made by the Importers and Kingtom. Plaintiffs rely upon and adopt by reference Kingtom's 56.2 brief and discussion on CBP's application of adverse inferences.

Significantly, many of the purported discrepancies cited by CBP are irrelevant to the objective of the EAPA investigation. The purpose of the investigation is to determine whether Kingtom's exports of aluminum extrusions to Plaintiffs were Chinese-origin. The information requested by CBP regarding the sales and accounting of the Plaintiffs, for example, is ultimately irrelevant to that determination. Neither the specific dollar value of the imports nor the specific quantity of the exports is ultimately relevant to the determination. It appears, in fact, that CBP has requested signficant quantities of irrelevant and unnecessary information which has resulted in an overly complicated record. The BPI record has in excess of 27,900 pages and the public record has in excess of 23,300 pages.

CBP's statement that Plaintiffs provided no explanation as to why there are differences in documents submitted by Plaintiffs and those submitted by Kingtom, is disingeous. In fact, the data provided by the Plaintiffs was detailed and complete. CBP never identified, or requested an explanation, for the differences in the factual record, but merely requested additional data.

These purported discrepancies identified by CBP can be divided into the following categories.

- Differences between Kingtom's and Plaintiffs' financial records; and

- Discrepancies between trip reports submitted.

### i. *Differences between Kingtom's Financial Accounts and Plaintiffs' Financial Accounts*

The documentary discrepancies are enumerated on pages 14 and 15 of the TRLED's Initial Determination. Items 1 to 3 relate to Kingtom's documents. Plaintiffs incorporate by reference herein Kingtom's responses to these alleged discrepancies in its 56.2 brief.

Items 4 to 10 concern alleged discrepancies related to Global Aluminum. Item 4 related to Table 9 and represented differences between GA's and Kingtom's financial records. A majority of the transactions had differences of between [       ]. In each case, the amount recorded in Kingtom's bank statements was [      ] than the GA value. Such amounts reflect the fact that GA [       ]. *See* CR 437 at 3-6. Kingtom, as is normal for any business that [

      ]. 19 of the 28 transactions involved these bank charges. *See* CR 463 at Table 9 (lines 4 -7, 13-17, 19, 21-27 and 30 of Table 9). Lines 1 and 3 each represent the same sum – one recorded by Kingtom and the other recorded by GA on different days (October 29 and October 30). Lines 8 and 9 are close in value and date, and should offset against each other. *See id.*

Other lines in Table 9 of TRLED's Initial Determination are for dies and scrap charges, which do not appear to be recorded in Kingtom's accounts receiveable as they are not for the sale of goods, but as they represent payments by GA are reported in the GA bank records. As supported by pages 5-7 of the accounts payable trial balance, lines 2, 10, 12, 18, and 20 relate to die charges and line 28 is a scrap charge. *See* CR 425 at 5-7 and Exhibit D. Finally, line 32 is for a transaction from February 2020. It does not appear in Kingtom's Exhibit 8, the source cited by CBP. This RFI was submitted by Kingtom in March of 2020. It is not extraordinary that a transaction from February was not present in a submission made in March. *See* CR 260 at 140 and Exhibit 8. This

leaves a total of two discrepancies (lines 11 and 23) which are more than $[    ], which are only partial discrepancies representing a small portion of the total amount, and which cannot be directly explained by the documents of record.

Item 5 relates to Table 10 for which there are similar explanations. Lines 1 and 3 through 29 are for values less than $ [   ]. *See* CR 463 at Table 10. These are also bank charges. Line 2 is referenced above as line 3 of Table 9. Line 30 of Table 10 is the same as line 32 of Table 9.

Item 6 relates to Table 11. There is no discrepancy, rather it is simply that the line on the bank statement in Exhibit K was not highlighted. *See* Exhibit K to GA's RFI Response of March 27, 2020, Not In Initial Record Filed with the Court. An examination of the reference in Exhibit H [                    ] agrees with the reference in Exhibit K (the second [          ] cash withdrawal of the month). *Id.*

Items 7 and 8 relate to Tables 12 and 13. With respect to Tables 12 and 13, as acknowledged by CBP, it is unaware as to the specific details as to how Kingtom calculated the weights in Exhibit 11. *See* CR 463 at 22-23. However, as discussed above, in the aluminum extrusions industry, the number of extrusions in an order is the critical data, with the understanding that weights of a manufactured product will vary within reasonable tolearances for a range of reasons.

Item 9 relates to Table 14. This was an error made by CBP in calculating the totals from the data from Exhibit S-21 of Kingtom's Supplemental RFI Response. CBP simply reports a summary total from Exhibit S-21. Adding up the appropriate lines from Exhibit S-21 establishes that CBP omitted [                  ] of 6/23/19. *See* CR 403 at p. 9 of Exhibit S-21.[1] The relevant

---

[1] CBP erroneously cited to Exhibit S-21 of Global Aluminum in the Initial Determination. There is no Exhibit S-21 submitted by Global Aluminum, and the relevant information is in the Kingtom Supplemental RFI Response.

page and line reports a weight of [          ] and a value of [                ].   Adding this value to Table 14 produces a total value for Exhibit S-21 of [               ] and a weight of [             ]. The values, when correcting for the CBP omission, for Exhibits S-21 and Exhibit 13 **are identical** and there is no discrepancy.  The total weight in Exhibit S-21 is greater by [              ] pounds. As discussed above, weights are calculated on different bases, and this difference can likely be explained if more data were obtained.

Item 10 further relates to differences between purchase order quantities and the amounts for one entry ([              ]359-4). The quantity difference between invoice [                ] and purchase order number [        ] was the result of a quality issue.   During production in the Dominican Republic, Kingtom tested the material and found some to be damaged. Based on previous agreements between GA and Kingtom made in [        ], Kingtom was required to [

                                                                    ]. *See* CR 465 at 25-26.  GA notes that purchase orders contain tolerances and that a weight on a purchase order is only a theoretical weight and the final weight will vary based on the weight of the actual production. The weights of specific parts will vary slightly from article to article due to the nature of the manufacturing process.  The review of incoming purchases focuses on the number and type of products, not the detailed weights.  GA contends this is a common practice in this industry because of the minor weight variations in production and production issues such as damages in the dies or lack of paint, among others and is consistently applied. *Id.*

While the invoices do not provide a grand total weight, when calculated the invoices [                                                    ] have the total weight as the CBP 7501s; [                                    ], respectively. See chart below:

| [KT2019080] TOTAL WEIGHT (KG) | [B16000000013] TOTAL WEIGHT (KG) | [KT2019040] TOTAL WEIGHT (KG) |
|---|---|---|
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | | |
| [ | [ | |
| | [ | |
| | [ | |
| | [ | |
| | [ | [ |
| | [ ] | |
| | [ ] | |
| | [ ] | |
| | [ ] | |
| | [ ] | |
| | [ ] | |
| | [ ] | |
| | [ ] | [ |

With respect to the purportedly missing purchase orders, the purchase orders relating to entry [          ]362-6 and [               ]780-9 were inadvertently not included in the original response to the RFI. GA supplied CBP with such information in its Supplemental RFI response for EAPA 7423 and would have provided this information in the EAPA investigation on appeal if CBP had identified the discrepancy and requested the missing information. *Id.*

Items 11 to 16 relate to certain transactions between Hialeah and Kingtom. Item 11 relates to a difference of a single line on invoice [              ]. These differences are reported on Table

15. *See* CR 463 at Table 15. The difference in the original document submitted by Kingtom was merely [                    ] – these amounts are entirely trivial. Moreover, the corrected version submitted in the supplemental response had no differences. *Id.*

Item 12 relates to a single item on invoice [                    ]. These differences are reported on Table 16. As noted in the e-mail provided in Hialeah's RFI, there was an error in the invoice and a corrected invoice was issued. *See* CR 275 at 181-194. Hialeah provided both versions of the invoice in its RFI -- and the revised invoice had no discrepancies. *See* CR 277 at 20, 22. In any event, the discrepancies were miniscule, consisting of a difference of [     ] KG [          ] out of a total shipment weight of nearly [          ] KG and a difference of only $ [          ] [          ] out of a total value of more than $ [          ].

Item 13 relates to certain freight values. These differences are reported on Table 17. *See* CR 463 at Table 17. The first of these relates to the corrected invoice discussed in response to Item 12. The freight had been omitted from the original invoice, but was included in the corrected invoice. *Compare* CR 277 at 20 *with* CR 277 at 22. The second relates to the invoice discussed in response to Item 11. The differences were small. and based on the actual freight charge. *Id.* Not only are these minor differences insignificant and irrelevant to the determination of whether Kingtom produced these aluminum extrusions in the Dominican Republic, there is also a very reasonable explanation.

In the normal course of business, Kingtom prepares an invoice that is issued to the importer for purposes of payment and import declaration as well as a separate export invoice that is declared to the Dominican Republic Customs. *See* PR 297 at 8-9. Because Kingtom is located in the DR Free Zone, it must comply with strict Customs inspection. Kingtom's products are sold on a weight-basis, and all of the empty containers and full containers leaving Kingtom must be weighed

by the weighbridge. *See id.* The difference between the same empty container and the full container is the weight of goods in the container. As of March 2019, DR Customs required that the total weight shown on the export invoices match exactly with the same weights shown on the weighbridge. *See id.* Before Kingtom outbounds the goods, and since different goods have a different unit price, Kingtom weighs the goods item-by-item by a crane scale and then loads them into the container. *See* PR 297 at 9. Once Kingtom finishes loading the container, it issues the invoice to the U.S. importer based on the outbound weight used by the crane scale. As can be expected, there is a small difference in weights measured using different scales. In order to comply with DR Customs' requirements, Kingtom must revise the weights shown on the weighbridge, which may differ from the weights measured by the crane scale, for purposes of its export invoice. In order to revise the weight on the export invoice to match the weight shown on the weighbridge, Kingtom's financial department revises the weight of the last item on the invoice. *See id.*

Regarding the ocean freight value of [          ] on Kingtom's invoice for Invoice Number [                ], Kingtom's financial department mistakenly used that value instead of [          ] on the invoice provided by Hialeah. *Compare* CR 273-278 at Appendix F *with* CR 238. Notably, however, the invoices provided by Hialeah were used as the basis for actual payment to Kingtom. In addition, the value of [          ] is consistent with the ocean freight values listed on Invoice Numbers [                        ] for which there was no distinction between the invoices provided by Kingtom and those provided by Hialeah. *See id.*

These minor differences are insignificant and do not impugn the overall reliability of the information provided by Kington and Hialeah, nor serve as an example that Kingtom did not respond to the best of its ability. Indeed, minor differences in some documents are indicative of the parties' complete forthcoming and reporting of information obtained from their books and

records.

Item 14 relates to purported total invoice value differences. The two invoices at issue were discussed in response to Items 11 and 12. These differences are reflected in Table 18. The larger of the two differences is the result of the inclusion of a freight charge. The Hialeah invoice without freight is $[          ] and thus there is no discrepancy. *See* CR 277 at 22.

Item 15 relates to the total of weights reported on the respective invoices. This is reflected on Table 19. *See* CR 463 at Table 19. With respect to weight differences, we refer the Court to the discussion of Item 13. In addition, as noted by CBP, Kingtom's data do not explain the basis for the weight reporting.

Item 16 relates to differences between the summary totals for Kingtom and Hialeah. The difference in question was solely a "weight" discrepancy and the value did not have any discrepancy. With respect to the weight discrepancy, the above discussions on weight apply to this analysis as well.

Although Florida Aluminum is not a Plaintiff in this appeal, we address TRLED's identification of alleged discrepancies concerning Florida Aluminum for purposes of completeness and to demonstrate even further that CBP's determination to apply adverse inferences was unlawful.

Item 17 relates to Table 21. Table 21 reported a difference between the invoice amount and the payment amount of [          ]. CR 463 at Table 21. This difference is because CBP failed to include in Florida Aluminum's payments the deposit of [          ]. Including this deposit results in a difference of $0, or no discrepancy. *See* CR 464 at 8.

Item 18 relates to Table 22. *See* CR 463 at Table 22. The discrepancies, in part, are explained as the Kingtom invoices reported in Exhibit 11 would appear not to include the iron

basket and packing, with the remainder falling within the weight tolerances. This is illustrated by Florida Invoice [                    ]. CR 420 at 20. It reported a weight of [        ] based on the packing list supplied in the supplemental RFI. CR 420 at 20. This weight was calculated by taking the [                                                    ]. This total weight included an [                                        ]  This produces a net weight of product of [         ].   The reported weight in Kingtom's Exhibit 11 was [        ]. The difference was [                                    ].   This is a minor weight discrepancy that can be explained by the weight of any packaging (as opposed to packing) or weight tolerances between the theoretical weight and the actual production weight.

Item 19 relates to Table 23.   This alleged discrepancy was the result of CBP's error. As calculated by CBP, the total for Florida Aluminum for line "Totals Exhibit S-21" only included [ ] invoices. *See* CR 463 at Table 23.  However, as shown in Florida Aluminum's Supplemental RFI, Florida had a [                              ] which would explain the higher reported weight and value in Exhibit 13. CR 420 at 5.  CBP simply omitted one of Florida's transactions and created an artificial disparity that actually did not exist.

In sum, at least with respect to the importers, virtually all of the discrepancies can be readily explained with the facts of record.   The few remaining discrepancies could be easily explained if CBP had identified the discrepancy and requested an explanation.   In evaluating these purported discrepancies, it is important to note that "perfection" is not a reasonable standard.  As noted by the Court in *Fujian MacH and Equip. Import & Export v. U.S.*., 276 F.Supp. 2d 1371 (Ct. Int'l Trade 2003)

> 'a completely errorless investigation is simply not a reasonable expectation', it would be unfair to a respondent if Commerce were permitted to extrapolate from a single error, which may well have been an isolated oversight, a conclusion that the entirety of the

respondent's submissions concerning other classes of subject merchandise are unreliable.

As discussed above, this matter presents at most a few minor issues all of which could be readily explained if CBP had asked the question.

### ii. *Discrepancies between Reports of Site Visits to Kingtom*

CBP had a significant advantage in this investigation with multiple trip reports from many different individuals. CBP did not take advantage of these reports, and primarily used minor discrepancies to denigrate the reports. Rather than focusing on the numerous common facts, and the absence of any evidence of actual trans-shipment or evasion, CBP focused either on information not present in the reports, or differences in the perceptions of the visitors and improperly elevated the report of alleger to a special status.

CBP made multiple errors in its evaluation of the trip reports. First, CBP did not include all of the trip reports in its evaluation. GA submitted, as part of its Voluntary Submission of Factual Information, an affidavit from [

.] *See* CR 223 at 281 at 2-3. The TRLED Initial Determination is devoid of any mention of this affidavit, which is a trip report, and the facts provided therein.

Second, CBP appears to have given undue weight to the affidavit submitted by the Alleger's expert. The conclusions in the Alleger's report were contrary to the trip reports submitted by the importers and the Attache Report. Alleger's report was also contrary to the CAFTA verifications. The Alleger's so-called "expert's" report, in fact, contains numerous errors on its face raising significant questions about its credibility.

Alleger's "expert" argues that the absence of inventory on the day of the visit led to questions. The report stated, "to maintain the inventory level required to keep prices at Kingtom's

22

levels (i.e., low) Kingtom would require near daily deliveries of raw materials." CR 463 at 9. This statement is simply wrong on multiple counts. As shown in the material delivery reports, raw materials are, in fact, delivered on a frequent basis, and, in fact, a major delivery occurred the following day. *See* CR 463 at 24. In fact, one of the GA visits occurred immediately after the visit by the Alleger's "expert." The photographs provided shows that substantial inventory of raw material had been received between the visit by the Alleger's "expert" and GA's visit. *See* CR 438-439.

Further, Alleger's "expert" based his view on inventory levels on an assumption that Kingtom's prices were at "low" levels. This, however, is contrary to the record. For example, in Exhibit A to its Voluntary Submission, GA's third-party expert stated that the prices paid to Kingtom were not low, when compared to other sources. *See* CR 281 at 2-3. Rather, Kingtom's prices were higher, and the sales were the result of the close proximity of the Dominican Republic to GA. *See id.*

Further, the Alleger's "expert" made an extraordinary claim that if Kingtom had produced all of the finished extrusions, such extrusions would have the same labels and packing. *See* CR 303-304. This is, again, belied by the facts. As shown in Exhibits K and L of its Voluntary Submission (CR 303 – 304), Kingtom produced extrusions to order and labeled and packed the extrusions using the labeling and packaging required by the customer. In sum, the Alleger's "expert" made assumptions based on an inaccurate set of facts and drew conclusions based on these inaccurate assumptions.

In contrast, the numerous trip reports supplied by the Importers supports a finding that Kingtom produced aluminum extrusions in the Dominican Republic. CBP's criticisms of these trip reports primarily focused on the fact that they did not report identical information. This is not

surprising. Each importer had different requirements and different levels of review. Such reviews were also over a period of 14 months. It is not remarkable, for example, that a machine would be down for repairs or maintenance at one point during the 14 – month interval and operating at another point during this same 14-month period.

CBP also understated the number of visits to Kingtom by the Importers. As noted in GA's response to CBP's RFI, GA visited Kingtom on four different occasions, not two. *See* CR 438 – 439. Further, as discussed, above, CBP completely ignored an affidavit of a third-party providing a report of the affiant's trip to Kingtom.

With respect to the two other detailed reports submitted by GA, CBP tries to downplay this report by noting that GA made no mention of the equipment that it saw operating. This denigration is wholly unsupported by the facts. CBP ignores, in total, the affidavit submitted by GA in which the third-party expert delineated, among other facts, the equipment at the facility. In other words, contrary to the implications of CBP, GA did provide a written list of equipment seen during a trip.

Furthermore, CBP also ignores the clear and uncontroverted fact that while GA did not specifically list the equipment that it saw operating, it did provide both time-stamped photographs and video showing operating equipment taken by GA on their visit. *See* CR 305-306 at 7-8; 312 at Exhibit N.

CBP's analysis of these trip reports should have acknowledged the common factors amongst them. All of the trip reports reported the presence of production equipment. All of the trip reports reported the presence of raw materials. CR 321 at p 20. None of the trip reports reported the presence of any Chinese-produced extrusions. The trip reports provide no evidence of circumvention or evasion, and to the extent that these trip reports contain any "evidence" to support a finding of evasion, such evidence is an "isolated tidbits of data which suggest a result

contrary to the clear weight of the evidence" and should be ignored.

Although TRLED's Initial Determination was based on the application of adverse inferences, OR&R's Final Determination was purportedly based on substantial evidence, as discussed below.

**B. SUBSTANTIAL EVIDENCE ON THE RECORD DOES NOT SUPPORT A FINDING OF EVASION**

CBP asserted in the OR&R Final Determination that "even without adverse inferences, the record supports the finding that Kingtom commingled Chinese-origin aluminum extrusions with aluminum extrusions it produced in the Dominican Republic before exporting shipments to the United States." PR 318 at 13. Not only does CBP fail to cite to any affirmative evidence of evasion by Plaintiffs, or evidence that Kingtom commingled and transshipped Chinese- and Dominican-origin aluminum extrusions, it relied on vague and conclusory assertions to reach its determination of evasion and repeatedly failed to adequately explain its reasoning. Accordingly, CBP's Final Determination should be reversed.

**1. Plaintiffs Did Not Make a Material and False Statement, Act or Omission**

The EAPA statute defines "evasion" as

[E]ntering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

19 U.S.C. § 1517(a)(5)(A); 19 C.F.R. § 165.1. Thus, the threshold issue is whether Plaintiffs made a material and false statement or material omission by entering Chinese-origin aluminum extrusions from Kingtom that were declared as Dominican-origin. Substantial evidence does not support a finding that Plaintiffs evaded the Orders by entering Chinese-origin extrusions

from Kingtom as Dominican-origin.

Aside from defining "evasion" under the EAPA statute, and providing some examples of what may constitute evasion, CBP's OR&R Final Determination failed to address whether Plaintiffs made any material and false statements, acts or omissions thereof. The plain language of CBP's Final Determination does not actually address the issue of material omission, or material and false statement or act. *See, e.g. Diamond Tools Technology LLC v. United States*, 2021 WL 5149856, *25 (Ct. Int'l Trade 2021) (finding CBP did not "address the issue of material *omission*, or material and false statement or act, which is covered both by the statute and Customs' regulations.").

CBP's determination relies on its unsubstantiated finding that Kingtom "did not operate at anywhere near full capacity." PR 318 at 13. Given Kingtom's purported close ties to China, CBP *presumes* that Kingtom must have transshipped and commingled Chinese-origin extrusions to the Plaintiffs. Such a dramatic leap in logic is unreasonable and is not rationally connected to the facts on the record. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 158 (1962) (substantial evidence requires that there be "a rational connection between the facts found and the choice made."); *Nucor Corp. v. United States,* 594 F. Supp. 3d 1320, 1331-32 (Ct. Int'l Trade 2008).

CBP has pointed to no evidence at all that Plaintiffs made such a material and, false statement or act, or material omission, and instead has inferred that the merchandise imported by Plaintiffs contained commingled Chinese-origin and Dominican-origin extrusions. As discussed in Section IV.B.2, *infra*, CBP has not (and cannot) cite to specific record evidence that certain aluminum extrusions imported by the Plaintiffs from Kingtom were, in fact, Chinese-origin, a pre-requisite to finding that Plaintiffs made a material, false statement or omission. *See, e.g., Diamond*

*Tools Technology LLC v. United States*, 2021 WL 5149856 (Ct. Int'l Trade 2021).

In addition, CBP has improperly focused its inquiry and decision on whether record evidence supports a finding that "Kingtom produced *all of the aluminum extrusions that it exported* to the United States during the period of investigation (emphasis added)." PR 318 at 12. CBP's inquiry of the importers subject to the EAPA investigation is fundamentally flawed because its focus on whether Kingtom produced all of the extrusions that it exported does not account for whether other U.S. importers may have been the recipients of the alleged commingled Chinese-origin aluminum extrusions, rather than the Plaintiffs. Thus, the focal point of CBP's inquiry places an undue burden on Plaintiffs to account for *all* of Kingtom's production, when they collectively imported a very small fraction of Kingtom's exports.

We first note that the period of investigation is October 9, 2018 through the pendency of the investigation. *See* PR 11 at 2. The record contains import data from Descartes Datamye that purports to list all U.S. imports of aluminum extrusions from Kingtom between January 1, 2019 – June 11, 2019. *See* PR 3, at Exhibit 1, Attachment 5. Notably, the instant EAPA investigation covers only three of the more 25 importers identified as consignees of aluminum extrusions from Kingtom during the relevant period. *See id.* Tellingly, the reported metric tons of these three Importers during the period amounts to only 64 total metric tons. By comparison, U.S. importers collectively imported more than 1,825 metric tons of aluminum extrusions from Kingtom during the specified period. *See id*. Thus, the importers subject to the instant EAPA investigation imported a mere 3.5 percent (approximate) of Kingtom's total exports of aluminum extrusions based on the Descartes import data. *Id*. It is simply unreasonable for CBP to make the three small quantity importers subject to this investigation account for "all of the aluminum extrusions that [Kingtom] exported during the period of investigation."

At most, CBP's inquiry should have focused on whether Kingtom produced in the Dominican Republic sufficient aluminum extrusions to account for its exports to the investigated importers. Kingtom had more than adequate capacity to produce the quantity exported to those small quantity importers. *See* CR 397 and 399. CBP's expanded inquiry improperly placed the burden on the three small Importers to account for the origin of *all* of Kingtom's exports, which is simply not reasonable and is arbitrary and capricious.[2]

Second, the EAPA statute and regulations should guide CBP's inquiry. Instead of focusing on whether Kingtom produced *all* of the aluminum extrusions it exported to the United States, CBP's mandate is to determine whether the importers evaded the Orders by making a material and false statement, act or material omission, (*e.g.*, by actually entering Chinese-origin aluminum extrusions and declaring them Dominican-origin). As discussed below, CBP's determination is completely devoid of any evidence that the importers entered Chinese-origin aluminum extrusions that were declared as Dominican-origin. Instead, CBP's determination is rife with vague assertions and conclusory findings that simply do not amount to substantial evidence of evasion.

### 2. Vague and Conclusory Assertions Do Not Constitute Substantial Evidence of Evasion

OR&R's Final Determination claims that several factual findings purportedly constitute substantial evidence, but instead are vague and conclusory assertions that do not amount to evasion. Indeed, CBP has cited no affirmative evidence that the Plaintiffs entered commingled Chinese- and Dominican-origin aluminum extrusions. CBP cites to no evidence whatsoever that Kingtom purchased aluminum ingot or scrap (the main raw materials for production of aluminum

---

[2] Plaintiffs speculate that this may have been done for strategic purposes. By naming only three small importers, Ta Chen may have been hoping for non-responses, and thus obtain an adverse result which could then be used against all of the importers.

extrusions) from China or that Kingtom exported any Chinese-origin extrusions to the United States. There is simply no evidence on the record such as bills of lading, certificates of origin, import data, or any other documentary evidence of Chinese-origin extrusions in Kingtom's inventory, its exports to the Unites States, and importantly, its specific exports to Plaintiffs. To the contrary, substantial evidence on the record does show that Kingtom had more than adequate capacity to produce all of the extrusions that it exported to Plaintiffs, as discussed more fully in Kingtom's 56.2 brief and incorporated by reference herein.

### i.  *Photographs and Videos of Kingtom's Facilities*

CBP noted that Kingtom provided photographs and videos of its facilities, which CBP found not to "indicate production levels that would match the amount of aluminum extrusions exported." PR 318 at 12. However, CBP failed to provide a well-reasoned analysis as to why this evidence supports a finding of evasion. First, CBP did not even identify the specific videos and photographs to which it referred aside from a general reference to an exhibit. Second, it did not specify the amount of Kingtom's aluminum extrusions exported by which it compared the videos to determine whether adequate production occurred. It is unclear whether the "amount of aluminum extrusions exported" indicates all of Kingtom's exports during the POI, or just the exported quantity to the investigated importers. If the former, it is again unreasonable for CBP to attribute *all* of Kingtom's exports to three small quantity importers. It is also unclear why CBP found the level of production depicted in the photographs and videos insufficient as compared to Kingtom's exports. Regardless of CBP's unstated reasoning, the photographs and videos evidence a snapshot of Kingtom's production occurring on a certain day and for only "several minutes." PR 318 at 12. CBP stated further that "the videos do not evidence a significant number of employees working difference machines and also shows some equipment sitting idle in the several minutes long video." PR 318 at 12. CBP has not explained what constitutes a "significant number" of

employees, and provides no detail of the machines depicted, and ultimately why that information evidence evasion.

Instead, CBP ignored Hialeah's argument that a "several minutes long" video represents only a snapshot of Kingtom's production at a particular moment, and does not reasonably portray all of its production over time. *See* CR Doc. 466 at 25. CBP's conclusions regarding a single day, or even moment, of production at Kingtom's facility are not indicative of Kingtom's monthly production volumes, especially given that Kingtom produces extrusions to order and experienced variation in production over time. *See* CR 175 at 9; PR 199 at 9; *see also* CR 397; PR 258 at Exhibit S-18.

Moreover, CBP has an obligation to clearly explain its reasoning and substantiate its decision with record evidence. The Court has noted that the potential consequences for evasion extend far beyond the application of applicable duties and may consist of other enforcement measures by CBP. *See Diamond Tools Technology LLC v. United States*, Ct. No. 20-00060, 2021 WL 5149856, at *25 (Ct. Int'l Trade, Oct. 29, 2021). The "fact that there may be additional consequences to an importer from a finding of evasion punctuates the need for Customs to provide a well-buttressed and well-reasoned explanation for its conclusion." *Id.* Here, CBP simply has not met its obligation to provide a well-reasoned and substantiated explanation for its decision. Given the voluminous record evidence of years of Kingtom's production of aluminum, CBP must explain why a "several minutes long" video and a few photographs fairly detract from that information. *See CS Wind Vietnam Co., v. United States*, 832 F.3d 1357, 1373 (Fed. Cir 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)) ("the substantiality of evidence must account for anything in the record that reasonably detracts from its weight.").

###### ii.    *Site Visit By U.S. Government Officials*

The OR&R Final Determination cites as support for its evasion determination that "U.S. Government officials observed minimal production during their site visit" as disclosed in the Attache Report. *See* PR 318 at 12.  As with videos and photographs, CBP again ignored Hialeah's argument that the government visit is representative of a single day in Kingtom's production and is not indicative of Kingtom's overall production capability. *See* CR 466 at 25; PR 297 at 25.  As it is representative of only a single point in time, the Attache Report does not provide sufficient evidence to call into question years of production information Kingtom placed onto the record.

Additionally, CBP's site visit had not been conducted to review Kingtom's overall production capacity.  It was conducted as a site verification pursuant to the Dominican Republic-Central America Free Trade Agreement. CR 173.  The results of that verification was that Kingtom's aluminum extrusions are indeed Dominican-origin. CR 402.  Importantly, the site visit did not find evidence of Chinese-origin aluminum extrusions.  CR. 173.  CBP's Attache Report does not purport to speak to Kingtom's overall production capacity and references no review of records regarding Kingtom's overall production. *See id.*  Rather, it is limited exclusively to general observations of Kingtom and statements made by Kingtom officials in response to CBP questioning. *See id.*  Further, the report does not indicate that it was "done for the express purpose of making independent determinations that Kingtom was actually producing aluminum extrusions in an amount that would equal its total sales." CR 318 at 12.  Contrary to CBP's claims that it "observed minimal production during their site visit," CBP actually [

]. CR 173.

In sum, CBP has failed to explain why this information constitutes substantial evidence of evasion by the Plaintiffs or detracts from evidence on the record establishing that Kingtom had the

capacity to produce the extrusions that it exported.

### iii.    *Daily Production and Equipment Records*

The OR&R Final Determination cites as further evidence of evasion daily production records showing that Kington did not operate at full capacity. PR 318 at 12. CBP again failed to explain why it was necessary for Kingtom to operate at full capacity to disprove allegations of transshipment and commingling. Kingtom never claimed to be operating at 100% capacity, and in fact, explained that "[

]. Kingtom [                                                                            . ]" CR Doc. 377 at 28.

CBP called into question the veracity of Kingtom's production documents because Kingtom's equipment list purportedly shows machines being installed in different months than they began to produce extrusions according to production records, and different production capacities were allegedly reported between the daily production report and equipment log. PR 318 at 12. While CBP cited generally to the daily production reports and equipment log provided in Exhibits 19 and 21, respectively of Kingtom's RFI Response, CBP provided no other detail with respect to which equipment it compared and why this information was significant in its determination of evasion. Contrary to CBP's insinuation, Kingtom's production records do not demonstrate that Kingtom used equipment prior to the date it acquired the equipment and the equipment was ready to be used. Kingtom obtained the [        ] extrusion press in [

], CR 240, and Kingtom's production records correctly show that it was not used in production until [                    ]. CR Doc. 243. Similarly, Kingtom obtained the [        ] extrusion press in [                ], CR Doc. 240, and Kingtom's production records demonstrate the press was first used in [                    ]. CR Doc. 243. Additionally, CBP fails to explain which press in the production records allegedly has a different production capacity than the

32

equipment list. CR Doc. 318 at 12. An examination of both exhibits reveals no such discrepancy. CR 240 and 243.

CBP simply has not met its obligation to provide a well-reasoned and substantiated explanation for its decision, nor has it explained why this information fairly detracts from the voluminous evidence of Kingtom's production of aluminum extrusions. *See CS Wind Vietnam Co., v. United States*, 832 F.3d at 1373. Additionally, while CBP found that Kingtom did not produce all of the extrusions it exported, CR 318 at 12, CBP completely disregarded and failed to address that Kingtom's total production exceeded its total sales. CR Doc. 397.

CBP further ignored the Importers' arguments and evidence showing that Kingtom, had the capacity and did, in fact, produce a sufficient quantity to account for its exports to the United States. Record evidence establishes that Kingtom had at least three aluminum extrusion presses prior to July 2019. *See* CR 240. This information was further corroborated by each site visit report as discussed in Section IV.A.2, *supra*. None of the importers nor the Alleger assert that Kingtom had less than three presses. With these three presses, Kingtom could produce at least [

] pounds per month.[3] The sum of Kingtom's monthly export and domestic sales in pounds never exceeded this equipment production capacity of [              ] pounds per month. *See* CR 397 and 403. Kingtom's reported monthly theoretical production volume never exceeded this production capacity either.[4] Accordingly, record evidence does not demonstrate a

---

[3] Kingtom's three presses could produce [                        ] tons per month respectively for a total of [      ] tons per month. *See* CR 240. [      ] tons equates to [              ] pounds per month. *See* CR 463 at 14 n.90. Nevertheless, evidence on the record suggests that Kingtom could produce more than [      ] tons per month. *See* CR 378 at 35; CR 394 (providing monthly production caps for extrusion machines 1 through 3 higher than the amounts provided in Kingtom's RFI Response Exhibit 19 (CR240)); *see also* CR 378 at 34 (providing that the production capacity of extrusion machines may be higher than theoretical calculations where the technician is skilled).

[4] *See* CR 397 (reporting no monthly theoretical production volume exceeding [                    ]

lack of clarity or even contradiction regarding Kingtom's production capacity, nor its ability to produce its reported sales or production volumes with these three presses.

      iv. ***Importers' Site Visits***

As discussed in detail in Section IV.A.2, *supra*, all of the trip reports contained substantial evidence of production. None of these trip reports contained any evidence of the transshipment of Chinese-origin aluminum extrusions nor the presence of Chinese extrusions in Kingtom's facility.

### 3. Kingtom's "Strong Ties" to China Do Not Constitute Substantial Evidence of Evasion

The OR&R Final Determination explains that there is purportedly insufficient evidence of Kingtom's actual production in relation to the quantity sold, the question of where aluminum extrusions were sourced arises. *See* PR 318 At 12. CBP concludes that based on the totality of the circumstances surrounding Kingtom's purportedly "strong ties" to China, substantial evidence supports a finding that Kingtom commingled and transshipped Chinese-origin aluminum extrusions.

The evidence cited regarding Kingtom's "strong ties to China" is not affirmative evidence of commingling or transshipment. The fact that Kingtom employs Chinese workers and a *former* employee of Minfra, a separate unaffiliated Chinese aluminum extrusion producer, CR Doc. 463 at 5, 17, is not evidence of transshipment or evasion. Neither is Kingtom's establishment after the AD/CVD Orders or relationships to Chinese suppliers. Kingtom detailed every material that was provided by each supplier. CR Doc. 262. It does not follow that,

---

pounds per month) and CR 403.

because Kingtom purchases auxiliary materials minimally used in production from Chinese suppliers, Kingtom must necessarily export Chinese-origin aluminum extrusions. Further, Kingtom's relationships with [          ] input suppliers are a red herring. The acts of casting and then extruding billets into the aluminum extrusions converts the country of origin to the Dominican Republic regardless of the origin of the inputs, and CBP expressly found that Kingtom actually produces aluminum extrusion in the Dominican Republic. CR Doc. 463 at 17. 19 U.S.C. § 4033(b)(2)(A); Annex 4.1, Chapter 76, Dominican Republic-Central America Free Trade Agreement; *see also* NY N310801 (Apr. 14, 2020). CBP completely failed to find any shred of evidence that a Chinese extrusion was acquired through Kingtom's suppliers and did not explain how it could have concluded that a supplier actually provided Kingtom a Chinese-origin extrusion.

In fact, the establishment of extrusion production facilities in third countries by foreign companies and then staffing such facilities from the "home country" is neither new nor unusual. Producers frequently hire experienced people from outside the United States to work in their U.S. facilities This is readily established by facts of record in this investigation and upon review of the Alleger's operations. The Alleger is a U.S. producer that is owned by a publicly traded Taiwanese Company, has numerous foreign nationals in key positions. These individuals include the Chief Engineering Officer and the Controller. *See* CR 284 at pp. 13-14 and 16-17, and 321 at Exhibit C-1 ; PR 226-228 at pp. 13-14, and 16-17 and Exhibit C-1. This is clear evidence of a common industry practice. Kingtom is doing nothing more than that done by other companies establishing operations in third countries. No reasonable conclusion of transshipment can be drawn from a company following a common industry practice

The Court has consistently found that determinations based on the totality of the

circumstances must still be supported by substantial evidence. *See, e.g. HiSteel Co. Ltd. v. United States*, Ct. No. 20-00146, 2021 WL 4317690 (Ct. Int'l Trade Sept. 23, 2021). Given the recent passage of the EAPA statute in 2015, the Court has relatively few opportunities to review CBP's determinations of evasion based on the totality of the circumstances, and whether they have been supported by substantial evidence. Therefore, we look to the Court's review of analogous agency decisions based on the totality of the circumstances, and find instructive the Court's review of the U.S. Department of Commerce's ("Commerce") application of the particular market situation analysis in the antidumping duty context pursuant to Section 504 of the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) (the "PMS statute").

In applying the PMS statute, Commerce has regularly applied a totality of the circumstances test to analyze the market in question because there is generally inadequate evidence from a single factor to support a PMS finding. In *Nexteel Co., Ltd. v. United States*, Commerce reasoned that the "collective impact" of various factors (e.g., effects of imports of Chinese-origin primary inputs, strategic alliances, etc.) permitted it to make a PMS finding. 450 F. Supp. 3d 1333, 1338 (Ct. Int'l Trade 2020). Upon review of Commerce's remand redetermination, the Court found that "Commerce's finding of a particular market situation…relies on its continued argument, that despite the lack of evidence regarding Korean subsidization, the factors viewed collectively could support a particular market situation." *Id.* at 1339. The Court ultimately held ultimately that Commerce's PMS finding must be supported by substantial evidence on the record, both when viewing the factors individually and collectively.

In analyzing Commerce's finding that "strategic alliances" existed between a primary input supplier and the producer of subject merchandise, the Court found that Commerce put forth

"speculative conclusions that strategic alliance '*may* have created distortions' and 'have the *potential* to impact HRC pricing.'" *Id.* at 1342. The Court expressed that it "affords no weight to these speculative and conclusory statements as evidence. *Id.* Similarly, in *HiSteel Co., Ltd. v. United States*, the Court again found that Commerce's PMS finding was not supported by substantial evidence because it was based on "speculative evidence that strategic alliances [between the raw material supplier and manufacturer of subject merchandise] 'may' have an impact on Korean HRC pricing…," among other unsupported conclusions. Ct. No. 20-00146, 2021 WL 4317690, at * 11 (Ct. Int'l Trade Sept. 13, 2021). The Court noted that although "a totality of the circumstances test could be satisfied by the 'totality' of factors even when no one factor would satisfy the test alone, this does not mean 'that under a totality of the circumstances test, a collection of unsubstantiated allegations can be combined into a substantiated one." *Id.* at *9 (citing *Hyundai Steel Co. v. United States,* 415 F. Supp. 3d 1293, 1301 (Ct. Int'l Trade 2019).

In this case, and as the Court noted in *Hyundai*, "not even [the] collective impact [of unsubstantiated allegations] can fill the evidentiary void" that the Importers' purchases from Kingtom contained commingled Chinese-origin extrusions. *Hyundai Steel Co.*, 415 F. Supp. 3d at 1301. CBP has not pointed to a single shred of evidence that purports to show that the Importers' evaded duties by importing Chinese-origin extrusions. Instead, CBP relies on the totality of the circumstances, heavily depends on Kingtom's "strong ties to China" as evidence that Kingtom commingled and transshipped Chinese-origin aluminum extrusions. Just as the Court found in *HiSteel*, any "strategic alliances, affiliations, or strong ties between Kingtom and China that form the basis of CBP's decision must be supported by substantial evidence and show that any such relationships did impact Kingtom's alleged transshipment of Chinese-origin extrusions.

### C. CBP'S INVESTIGATION PROCEDURES VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS

Throughout the EAPA investigation, CBP erred procedurally in failing to disclose information that the agency relied on in its determination of evasion. CBP deprived the Plaintiffs of their due process right to be heard and to be defend themselves by : (1) failing to provide the Plaintiffs with an adequate public summary of the Attache Report, thus depriving Plaintiffs of any cogent understanding of what occurred and foreclosing a meaningful response; (2) denying the Plaintiffs the opportunity to review, evaluate or comment on proprietary evidence underlying CBP's determination, and thus defend themselves; and (3) imposing highly punitive interim measures without providing the Plaintiffs the opportunity to comment beforehand.

These procedural due process issues were presented to CBP, but the agency declined to address Plaintiffs' concerns, claiming that they were "outside of the purview of this de novo review." CR 463 at 11. Counsel to the Plaintiffs only now, on appeal, has the opportunity to view the confidential version of the administrative record, thus depriving Plaintiffs of the opportunity to rebut the allegations against them and the evidence on which CBP based its determination. These deficiencies cannot be remedied at this stage, because, as this Court recently observed: "{A}ccess to the complete record on judicial review cannot cure improper withholding of information by Customs . . . ." *Royal Brush*, 483 F. Supp. 3d at 1307 n.20. The record remains fatally incomplete because it lacks Plaintiff's responses to the so-called evidence that CBP withheld during the investigation.

The Fifth Amendment of the U.S. Constitution prohibits the deprivation of life, liberty, or property without due process of law. In a due process inquiry, the Court must first determine whether a protected interest exists. *See Diamond Tools Tech. v. United States*, Slip Op. 21-151, Ct No. 20-00060 (Oct. 29, 2021) (*citing Nereida Trading Co. v. United States*, 683 F. Supp. 2d

1348, 1354-1355 (2010). In *Royal Brush Manufacturing v. United States*, 483 F. Supp. 3d 1294, 1305 (2020), this Court established that an importer has a protected interest in a proper assessment of what process is due in an EAPA investigation. To comply with due process, "Custom's procedures must afford adequate opportunity for importers to respond to the evidence against them." *Id*. As this Court has recognized, "notice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the action and afford them an opportunity to present their objections." *Transcom v. United States*, 121 F. Supp. 2d 690, 708 (2000) (*quoting Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 319, 333 (1976). Significantly, due process "forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary proposition." *Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc*, 419 U.S. 281 (1974).

The EAPA regulations do not establish a procedure for the issuance of an administrative protective order or otherwise provide guidance with regard to the distribution of confidential information to interested parties. However, CBP's regulations do allow interested parties to request business confidential treatment for proprietary information placed in brackets. *See* 19 C.F.R.§ 165.4. Each submitter of confidential information is required to file a public version of the submission that "contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information." *Id*. at 165.49(a)(2). As discussed below, CBP did not follow its own regulations and failed to provide adequate public summaries of key documents relied upon in issuing its determination.

### 1. **CBP Failed to Provide Adequate Public Summaries of Information**

In making its determination, CBP failed to disclose to the Plaintiffs the information on which it based its evasion determinations. CBP, as part of its determination cited to secret information which, if it had been disclosed, could have been rebutted or explained. This failure deprived Plaintiffs of the opportunity to raise its defenses to the allegations. For example, there is

no public summary at all of the confidential Attaché Report of CBP's unannounced visit to Kingtom's facility in the Dominican Republic on July 31, 2019. CBP relied upon the Attaché's observations to support the conclusions drawn in its notice initiating formal investigation, the initial determination of evasion, and the ultimate determination of evasion in the administrative review. CR Doc. 172. By failing to provide the Plaintiffs with a public summary, as required, CBP not only violated its own regulations, but it also denied Plaintiffs their basic due process rights to understand the nature of CBP allegations against them.

CBP also failed to disclose the pre-initiation communications between CBP and the Alleger, thereby depriving Plaintiffs the ability to comment on such information, and depriving the Court of the opportunity to review such information that was never documented. Such information was critical as it would have revealed the gaps in the original allegation and the nature of the proposed gap filing by the purportedly neutral decision maker CBP.

Plaintiffs were similarly denied the opportunity to review, evaluate and comment on significant evidence found in other documents, described below, which also lacked adequate public summaries. For example, the Alleger redacted the confidential information in the narrative portion of its Allegation and omitted the exhibits but did not separately summarize the confidential information in a public document. CR 1-3. CBP also deleted significant information contained in its Notice of Initiation and Imposition of Interim Measures, and its Initial Determination, without providing any public summaries. PR 193; 278. With regard to each of the documents described above, there is no indication that the redacted information was not susceptible to public summarization. In short, CBP heavily redacted the administrative record and its determination, and failed to provide sufficient public summary of confidential information used against Plaintiffs in a manner that limited the ability to defend against CBP's allegations.

Plaintiffs call the Court's attention to *Royal Brush v. United States*, 483 F. Supp. 3d 1294, 1307-08 (Ct. Int'l Trade 2020) in which the Court found that CBP failed to afford the opportunity to be heard at a meaningful time and in a meaningful manner when it failed to ensure that confidential filings were accompanied by the requisite public summaries, as required by 19 C.F.R. § 165.4. This logic was also adopted by CBP when it moved for a voluntary remand in *Norca Industrial Co., LLC et al v. United States*, (Consol. Ct. No. 21-00192, Ct. Int'l Trade) in order to permit it to provide appropriate summaries. Such logic also applies in this case even more strongly, as not only were the public summaries insufficient, CBP did not even include in copies of the determination transmitted to each party their own confidential information as discussed below.

### 2. CBP Denied Plaintiffs the Opportunity to Comment on CBP's Findings Involving Their Own Confidential Information

Information submitted by each party, or to which they are ordinarily privy (*e.g.* Kingtom should have been disclosed the confidential Attache Report), is necessarily not confidential to each respective party and thus was improperly withheld. The information withheld was not only that of the other parties, which CBP claimed could not be released because of the absence of a protective order process, such information also included the information of each individual party. If CBP had released to Plaintiffs those portions of the decision containing their own factual information, Plaintiffs could have better understood the issues and would have had a meaningful opportunity to correct errors. For instance, Plaintiffs' ability to rebut alleged discrepancies upon which CBP based its adverse inferences finding, is demonstrated in Section IV.A.2, *supra*, where counsel was able to identify errors made by CBP in its list of discrepancies. Counsel was able to demonstrate further that other discrepancies did not exist or were not discrepancies as they were

the result of ordinary charges in business.  Had CBP disclosed the information early on, the parties

could have addressed these issues before incurring the cost, expense, delay of litigation.

### 3. <u>Plaintiffs Had a Due Process Right to Notice and an Opportunity to  Be Heard Before Imposition of the Duties</u>.

The Due Process Clause of the Fifth Amendment to the United States Constitution states

that no person shall be "deprived of life, liberty, or property, without due process of law;" and

Plaintiffs therefore have a right to "notice and a meaningful opportunity to be heard" prior to

such deprivation. *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed.

Cir. 2012) (quoting LaChance v. Erickson, 522 U.S. 262, 266 (1998)). Plaintiffs were not

notified of the investigation and were not provided an opportunity to present their case prior to

the decision to impose interim measures. CBP's denial of due process rights violate the U.S.

Constitution.  As explained in *Nereida Trading and Transcom, Inc. v. United States*, 121 F.

Supp. 2d 690 (2000), "the government must provide procedural due process—including both

notice and an opportunity to be heard—before, not after, the government makes a determination

and imposes duty measures, even interim ones."

This Court previously had an opportunity to discuss this issue tangentially in *Diamond

Tools Technology v. United States*, Slip. Op. 21-151, Ct. No. 20-00060 (Ct. Int'l Trade 2021).

In that decision, the Court stated that a protected interest may exist, but that Plaintiff had not

established the nature of the interest given that the interim measures are temporary.  The Court

distinguished cases such as *Nereida Trading*, 683 F. Supp. at 1354-1355 (examining whether

CBP's presumption of reimbursement and subsequent doubling of the duties deprived the

importer of due process) and *Transcom*, 121 F. Supp. 2d 690 (examining whether due process

what violated when CBP issue a final determination requiring that the importer pay additional

duties without prior notice) on the grounds that neither case addressed due process claims in the

context of interim measures.

While the interim measures are indeed temporary, they are extremely onerous, and they have seriously impacted the financial health of the small U.S. importers in this investigation. Although labeled "interim," the duties have in fact been in effect since November 2, 2020, a long time for a small U.S. business seeking to survive and maintain its customer base. CR 9-11. The interim measures here required that the affected importers post antidumping duties in the amount of 86.01%[5] after February 8, 2022 and countervailing duties in the highly punitive amount of 242.56% after February 9, 2022.[6] These exorbitant rates, put into effect without any notice or opportunity to comment, are prohibitive. To continue to import, Plaintiffs would be forced to divert considerable capital from other endeavors. Due to the Government's unilateral action, Plaintiffs have lost a trusted supplier overnight. Its relationship with customers have been jeopardized. Such consequences ensued even though the decision to impose interim measures was wrongly unaccompanied by the procedural protections required by the due process clause of the Fifth Amendment to the U.S. Constitution.

### D.  CBP SHOULD HAVE CONSOLIDATED EAPA INV. NOS. 7348 AND 7423

GA submits that CBP erred when it refused to consolidate this case with 7423 and that the failure to consolidate effectively denies GA its due process rights. 19 CFR 165.13(b) provides express standards for consolidating EAPA actions and CBP has consolidated other cases with similar overlaps such as EAPA 7454. This is reflected in the Notice of Initiation where CBP stated

---

[5] See Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2019–2020, 87 Fed. Supp. 7088 (Feb. 8, 2022).

[6] See Aluminum Extrusions From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2019, 87 Fed. Reg. 7423 (Feb. 9, 2022).

that "CBP may consolidate multiple allegations against one or more importers into a single investigation. The Regulation sets forth factors that CBP should consider in deciding whether to consolidate multiple allegations. These factors include, but are not limited to, whether the multiple allegations involve: 1) relationships between the importers; 2) similarity of covered merchandise; 3) similarity of AD/CVD orders; and 4) overlap in time periods of entries of covered merchandise".

These factors are all present in this matter. GA is named as an importer in both cases. Both cases cover the exact same merchandise – Aluminum Extrusions from the exact same supplier – Kingtom. Both cases also make essentially the same allegations that Kingtom allegedly does not produce Aluminum Extrusions in the Dominican Republic. The orders are identical. While the second case (7423) covers entries starting with a later date (entries entered for consumption, or withdrawn from warehouse for consumption from January 10, 2019, through the pendency of this investigation), the information sought by CBP and provided by GA in the first case (7348) (entries entered for consumption, or withdrawn from warehouse for consumption from October 9, 2018, through the pendency of this investigation) significantly overlaps with second case. In fact, **all** of the entries included in the second case are included in the first case. In other words, all factors support consolidation, and no factors support non-consolidation. While CBP has some discretion with respect to consolidation, under these facts, it would be a clear abuse of discretion to refuse to consolidate.

This is not harmless error. As a result of this refusal to consolidate, GA has been forced to engage (and will be forced to continue to engage) in substantial efforts to preserve its rights. Unlike all of the other parties, that only need to "win" one case to resume their business, GA must win two separate cases on essentially identical facts.

## V. __CONCLUSION__

For the foregoing reasons, we respectfully request that this Court reverse CBP's determinations and direct CBP to find that Plaintiffs did not evade the Orders by entering aluminum extrusions from Kingtom.

Respectfully submitted,

_/s/ Lizbeth R. Levinson_
Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell
FOX ROTHSCHILD LLP
2020 K Street, NW Suite 500
Washington, DC 20005
llevinson@foxrothschild.com
Counsel for Consolidated Plaintiff

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel for Plaintiff

Dated: February 14, 2022

## <u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>

   This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12-point Times New Roman font).  In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth therein.  Specifically, excluding those exempted portions of the brief, as set forth in 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 13,946 words.  This certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

         */s/ Lizbeth R. Levinson*

         Lizbeth R. Levinson
         Ronald M. Wisla
         Brittney R. Powell
         Fox Rothschild LLP
         1030 15th Street, NW Suite 380 East
         Washington, DC 20005
         llevinson@foxrothschild.com
         Counsel for Consolidated Plaintiff

         David J. Craven, Esq.
         CRAVEN TRADE LAW LLC
         3744 N Ashland Avenue
         Chicago, Illinois 60613
         Tel. 773-709-8506
         David.craven@tradelaw.com
          Counsel for Plaintiff

Dated: February 14, 2022